2000 SD 122

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Donald Eugene MOELLER, Defendant and Appellant.**

**Nos. 20127, 20154.**

Supreme Court of South Dakota.

Argued Oct. 21, 1999.

Decided Aug. 30, 2000.

Rehearing Denied Oct. 31, 2000.

Mark Barnett, Attorney General, Craig Eichstadt, Deputy Attorney General, Sherri Sundem Wald, Gary Campbell, Grant Gormley, Assistant Attorneys General, Pierre, for plaintiff and appellee.

Michael J. Butler, Sioux Falls, David R. Gienapp of Arneson, Issenhuth & Gienapp, Madison, for defendant and appellant.

MILLER, Chief Justice

[¶ 1.] Donald Moeller was previously tried, convicted and sentenced to death for the 1990 rape and murder of Rebecca O'Connell. We reversed that conviction in *State v. Moeller*, 1996 SD 60, 548 N.W.2d 465 (*Moeller I*). At his second trial Moeller was again convicted of first-degree rape and first-degree murder and was sentenced to death. He challenges, among other things, the denial of various continuance requests, the jury selection process, the admissibility of expert testimony, and several aspects of the sentencing phase of his trial. We affirm.

### FACTS

[¶ 2.] Nine-year-old Rebecca O'Connell (Becky) of Sioux Falls was last seen on the evening of May 8, 1990. The next day, two men found her body in a wooded area in Lincoln County, South Dakota. An autopsy revealed that she had been vaginally and anally raped, and had sustained knife wounds to her neck, back, shoulder, chest, hip, arms and hands. A pathologist concluded that she died as a result of a cut to her jugular vein.[1]

[¶ 3.] Donald Moeller was charged with rape and murder in connection with Becky's death. He was tried, convicted

---

1. Paragraph 174 contains a more detailed recitation of the circumstantial evidence linking Moeller to the crime.

and sentenced to death. On appeal, we reversed the conviction because prior bad acts evidence had been improperly introduced. The second trial commenced in April 1997.[2] He was again convicted and sentenced to death. He appeals.

## STANDARD OF REVIEW

[¶ 4.] Unless otherwise stated, every issue raised by Moeller is reviewed under an abuse of discretion standard. *State v. Letcher,* 1996 SD 88, ¶ 29, 552 N.W.2d 402, 407 (continuance requests); *State v. Darby,* 1996 SD 127, ¶ 36, 556 N.W.2d 311, 321 (juror qualifications); *State v. Smith,* 477 N.W.2d 27, 33 n. 4 (SD 1991); *State v. Miller,* 429 N.W.2d 26, 38 (S.D.1988) (juror voir dire); *State v. White,* 1996 SD 67, ¶ 19, 549 N.W.2d 676, 681; *State v. New,* 536 N.W.2d 714, 718 (S.D.1995); *State v. Olson,* 408 N.W.2d 748, 752 (S.D.1987); *State v. McNamara,* 325 N.W.2d 288, 291 (S.D.1982) (admissibility of evidence); *Moeller I,* 1996 SD 60, ¶ 87, 548 N.W.2d at 485 (expert opinions). We will not overturn the trial court's ruling absent an abuse of that discretion.

## ISSUE 1.

[¶ 5.] **The trial court did not abuse its discretion in denying Moeller's requests for a continuance of the trial date.**

### Facts

[¶ 6.] Prior to trial, Moeller's counsel filed four requests for continuance of the trial date, all of which were denied. He contends that, as a result of these denials, his attorneys were unable to be adequately prepared for trial. He argues that the trial court placed scheduling and expediency of trial over his fundamental rights to due process and effective assistance of counsel.

### Decision

[¶ 7.] " 'A continuance may properly be denied when the party had ample time for preparation or the request for a continuance was not made until the last minute.' " *Corson Village Sanitary Dist. v. Strozdas,* 539 N.W.2d 876, 878 (S.D. 1995) (quoting *Fanning v. Iversen,* 535 N.W.2d 770, 776 (S.D.1995)) (other citations omitted). However, an accused is entitled as a matter of right to a reasonable opportunity to secure evidence on his behalf. If it appears that due diligence has failed to procure it, and where a manifest injustice results from denial of the continuance, the trial court's action should be set aside. *State v. Dowling,* 87 S.D. 532, 534, 211 N.W.2d 572, 573 (1973) (citing *State v. Wilcox,* 21 S.D. 532, 535–36, 114 N.W. 687, 688–89 (1908)).

[¶ 8.] Other factors trial courts must consider in deciding whether or not to grant a continuance include: (1) whether the delay resulting from the continuance will be prejudicial to the opposing party; (2) whether the continuance motion was motivated by procrastination, bad planning, dilatory tactics or bad faith on the part of the moving party or his counsel; (3) the prejudice caused to the moving party by the trial court's refusal to grant the continuance; and (4) whether there have been any prior continuances or delays. *Evens v. Thompson,* 485 N.W.2d 591, 594 (S.D.1992) (citations omitted). Additionally, when a continuance is requested for lack of time to prepare, the court must consider (1) whether the accused has had ample time to prepare for trial and (2) whether additional time would allow the defendant to be any better prepared to go to trial. 22A CJS *Criminal Law,* § 624 (1989).

[¶ 9.] In *United States v. Medlin,* 353 F.2d 789, 793 (6thCir.1965), *cert. denied,* 384 U.S. 973, 86 S.Ct. 1860, 16 L.Ed.2d 683 (1966), the court was presented with a

---

2. The Honorable E.W. Hertz was the judge at the first trial. In the interim between the first and second trials, Judge Hertz retired. The case was assigned to Presiding Judge Arthur L. Rusch for the second trial.

similar issue. There defendant's counsel claimed he had inadequate time to prepare, detailing the long hours he had already spent on the case and stressing the attention diverted to other obligations of his practice. The trial court denied the motion, and the court of appeals affirmed, relying on the fact that the attorney had been engaged close to a year before trial and in that period of time had employed numerous pretrial procedures to prepare for the accused's defense. Further, the court noted that counsel had not shown what might have been done to enhance his preparation for trial. Finally, it affirmed because it found that no prejudice to the defendant resulted from the denial of the continuance.

[¶ 10.] Here, a period of ten months elapsed between the time Moeller's first conviction was overturned and the time his second trial commenced. The record shows that both of his defense attorneys worked diligently to prepare an effective defense and did an admirable job in presenting a thorough case. *Cf. State v. Lang*, 354 N.W.2d 723 (S.D.1984) (stating that despite defendant's claim of unpreparedness, he was able to procure and present seven alibi witnesses at trial). Moreover, it must be remembered that both defense attorneys also represented Moeller in his first trial and therefore were familiar with State's case and the concededly voluminous file. There was no specific showing how additional time would have aided the defense any more in its preparation.

[¶ 11.] Moeller's counsel place great emphasis on the fact that they did not wait until the last minute to request a continuance. Indeed, they filed the first request almost eight months in advance of the trial date. They claim their combined experience in defending five death penalty cases, and over twenty murder cases, led them to conclude that eight months was an inadequate amount of time to prepare for trial. We do not find their argument persuasive.

[¶ 12.] Moeller also argues that the trial court violated his constitutional rights by interpreting SDCL 23A–44–5.1 to require that both parties must stipulate to a waiver of the 180–day rule. His argument seems to be that only the defendant must waive the 180–day rule, and that by requiring State to consent to such a waiver, his rights to due process and effective assistance of counsel were violated. This position is untenable. First, the 180–day rule is a procedural rule of court and not a constitutional requirement. *State v. Sorensen*, 1999 SD 84, ¶ 12, 597 N.W.2d 682, 684; *State v. Fowler*, 1996 SD 79, ¶ 11, 552 N.W.2d 391, 393; *State v. Erickson*, 525 N.W.2d 703, 711 (S.D.1994). "Violation of the 180–day rule is not synonymous with violation of a constitutional right to a speedy trial." *Sorensen*, 1999 SD 84, ¶ 12, 597 N.W.2d at 684 (citing *Erickson*, 525 N.W.2d at 711). What Moeller essentially contends is that he not only has a constitutional right to a speedy trial, but he also has a constitutional right to *not* have a speedy trial. This argument wholly lacks merit.

[¶ 13.] Moeller had approximately ten months from the date the remittitur was filed in *Moeller I* to prepare his defense. This is an adequate amount of time. The trial court did not abuse its discretion in denying his continuance requests.

## ISSUE 2.

[¶ 14.] **The trial court did not abuse its discretion in denying Moeller's request for a continuance of the pre-trial DNA admissibility hearing.**

### Facts

[¶ 15.] After we reversed Moeller's first conviction, a status hearing was held and a proposed scheduling order was presented to the parties. The court established January 13, 1997, as the date for a *Daubert*[3] admissibility hearing pertaining to anticipated DNA evidence. On August

---

3. *Daubert v. Merrell Dow Pharmaceuticals,* *Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125

23, 1996, Moeller filed an objection to such date, claiming that it afforded insufficient time to prepare. The objection was overruled.

[¶ 16.] On December 11, 1996, State filed motions identifying the DNA evidence it planned to introduce at trial, which was to be the subject of the scheduled January hearing.[4] Six days later, Moeller's counsel filed a request for the continuance of the *Daubert* hearing, claiming that they would not have adequate time to discover and review the results because State had not yet completed testing on all anticipated DNA evidence. After a hearing, the trial court granted Moeller's motion and rescheduled the *Daubert* hearing to March 3, 1997.

[¶ 17.] On February 19, 1997, Moeller filed a third *Daubert* hearing continuance request. He claimed that his counsel had not received the DNA test results in time to conduct a meaningful review, that they had underestimated the amount of time necessary to prepare, and that there now existed a conflict between the hearing date and the defense expert's schedule. The trial court denied the motion as untimely, stating in a letter opinion that the defense had approximately three months' advance notice of the specific DNA testing which State intended to introduce at trial.

[¶ 18.] At the *Daubert* hearing on March 3–4, 1997, the defense requested and received a standing objection to any testimony concerning the admissibility of the DNA evidence. Moeller's attorneys conducted virtually no cross-examination of State's experts and presented no expert of

their own to rebut State's testimony concerning PCR testing of the various DNA markers. The trial court subsequently granted State's motion to admit the DNA evidence, finding that it met the *Daubert* standards of relevance and reliability.

[¶ 19.] In regard to Moeller's claim that he was not adequately prepared for the hearing, the trial court stated:

> The Defendant was afforded every opportunity to present evidence and choose [sic] not to take advantage of that opportunity. The court would assume that counsel for the defendant would argue that they were not afforded an "opportunity" because they were not given the time that they wanted to prepare....
>
> ....
>
> A fair interpretation of [the] facts indicates that the defense's claims that they had no witnesses, had been unable to consult with their consultant, and had not had adequate time to secure expert witnesses for the hearing or to commence the preparation of the "intricacies" in connection with the DNA is not credible. The court would conclude that the decision by the defense not to present witnesses or examine witnesses at the *Daubert* hearing was a tactical decision made with the intent to create the appearance of error and not the result of being denied an opportunity to do so.

[¶ 20.] On appeal, Moeller contends that it was necessary to have the complete DNA test results well in advance of the *Daubert* hearing, so that his defense experts could review them in time for the

---

L.Ed.2d 469 (1993). We adopted the *Daubert* standard for admissibility of expert testimony in *State v. Hofer*, 512 N.W.2d 482, 484 (S.D. 1994). *See also, State v. Loftus*, 1997 SD 131, ¶ 21, 573 N.W.2d 167, 173; *Bland v. Davison County*, 1997 SD 92, ¶ 35, 566 N.W.2d 452, 462; *Kuper v. Lincoln–Union Elec. Co.*, 1996 SD 145, ¶ 40, 557 N.W.2d 748, 760. Under *Daubert*, the trial judge has the task of ensuring that an expert's testimony both "rests on a reliable foundation and is relevant to the task at hand." *Hofer*, 512 N.W.2d at 484 (quoting *Daubert*, 509 U.S. at 597, 113 S.Ct. at 2799, 125 L.Ed.2d at 485).

4. The motions sought to introduce testimony regarding (1) typing of the D1S80 marker using the PCR (polymerase chain reaction) amplification technique; (2) typing of STRs and Polymarkers using the PCR amplification technique; (3) typing of the DQ-alpha marker using the PCR amplification technique; (4) typing of the APO–B marker using the PCR amplification technique; and (5) estimation of profile frequencies and match probabilities of these markers.

hearing. He argues that because of numerous delays in testing by State, he was not able to receive the results in time to prepare. He asserts that the denial of his continuance requests constituted an abuse of discretion. We disagree.

## Decision

[¶ 21.] Earlier herein in Issue 1, ¶¶ 7–8, *supra*, we discussed the factors which must be considered and applied regarding continuance requests. *Corson Village*, 539 N.W.2d at 878. *See also* 22A CJS *Criminal Law*, § 624 (1989); *Evens*, 485 N.W.2d at 594.

[¶ 22.] Moeller's attorneys also represented him during the first trial and appeal, where PCR amplification and typing of the DQ-alpha marker were briefed and extensively discussed. Upon query by the trial court, one of Moeller's counsel admitted to being put on notice as early as May or June of 1996 that State planned to introduce evidence of APO–B typing. The defense also had notice as early as December 1996 of the other markers that State planned to introduce. Moreover, a DNA expert was appointed for Moeller in October 1996, and this expert was present for all State testing of DNA evidence that was admitted at trial. Consequently, the defense had access to first hand reports of testing being conducted by State. Finally, one continuance was previously granted to give the defendant additional time to prepare. Moeller has not specifically shown how a second continuance would have aided his presentation of a defense, other than to say it would have given his counsel more time to prepare.

[¶ 23.] Moeller argues that "[w]hile it is true that a general knowledge of PCR technology, and general legal issues concerning admissibility under *Daubert* of DNA typing could be reviewed prior to the

hearing," he should have been given sufficient time to review the reports, photographs and bench notes of work completed in the DNA testing lab. He contends that "only when discovery is received and reviewed with a qualified expert can it be determined whether proper protocols, procedures and standards were adhered to in conducting, and interpreting the test results." This information, however, goes to the weight of the evidence, not its admissibility. *See Moeller I*, 1996 SD 60, ¶ 73, 548 N.W.2d at 484 (stating that an expert's alleged professional and technical deficiencies go to the weight and credibility of the testimony rather than its admissibility); *United States v. Beasley*, 102 F.3d 1440, 1448 (8thCir.1996); *United States v. Johnson*, 56 F.3d 947, 953 (8thCir.1995); *United States v. Martinez*, 3 F.3d 1191, 1198 (8thCir.1993), *cert. denied*, 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994) (holding that deficiencies in procedures go to weight rather than admissibility); *Fugate v. Commonwealth*, 993 S.W.2d 931, 935 (Ky.1999) (holding same). Thus, contrary to his argument, it was not imperative that Moeller receive the results of the DNA testing prior to the *Daubert* hearing.[5]

[¶ 24.] Because Moeller had ample time to prepare for the DNA-related methodology discussion conducted at the March 1997 *Daubert* hearing, the trial court did not abuse its discretion in denying his motions for a continuance.

## ISSUE 3.

[¶ 25.] **It was not prejudicial error to refuse to remove prospective jurors for cause.**

### Facts

[¶ 26.] During the jury selection process, there were eight venirepersons that Moel-

---

5. Were we to accept Moeller's proposition that he needed the results of the DNA tests in order to begin preparing for the *Daubert* hearing, his position is still without merit. The record shows that he received the APO–B evidence on December 26, 1996. In addition, he received all other final marker results except one on January 23, 1997. For the one remaining marker result, a preliminary conclusion was included in the January 23, 1997, discovery. That preliminary result was confirmed by State's expert on February 11, 1997. Thus, Moeller had the results in his possession more than 5 weeks in advance of the *Daubert* hearing.

ler challenged for cause based on their responses to counsel's questions regarding the death penalty. The trial court denied the challenges. Moeller exhausted all twenty of his peremptory strikes, eight of which were used on the venirepersons that were challenged for cause.

[¶ 27.] On appeal, Moeller contends that failure to remove the jurors challenged for cause forced him to exhaust his peremptory challenges, leaving him with insufficient peremptory challenges to strike one seated juror who should have been stricken. He argues that five of the prospective jurors evinced a constitutional inability to serve impartially and four others [6] evinced a statutory inability to serve impartially.

**Decision**

[¶ 28.] "Before we will reverse a trial court's refusal to disallow for cause potential jurors, the movant must show actual prejudice resulting from the trial court's decision." *Darby,* 1996 SD 127, ¶ 36, 556 N.W.2d at 321 (citing *State v. Blue Thunder,* 466 N.W.2d 613, 620 (S.D. 1991)). " 'Reversible error exists only where defendant can demonstrate material prejudice.' " *Id.*

[¶ 29.] Both the South Dakota and the United States Constitutions guarantee trial by an impartial jury. S.D.Const. art. VI, § 7; U.S.Const. amend. VI; *Morgan v. Illinois,* 504 U.S. 719, 728, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492, 502 (1992); *State v. Rhines,* 1996 SD 55, ¶ 41, 548 N.W.2d 415, 430; *State v. Hansen,* 407 N.W.2d 217, 220 (S.D.1987). "Jury selection is an important means of ensuring this right. The voir dire process is designed to eliminate persons from the venire who demonstrate they cannot be fair to either

side of the case." *Rhines,* 1996 SD 55, ¶ 41, 548 N.W.2d at 430 (citations omitted).

[¶ 30.] One of the primary responsibilities of a trial court is to make certain that a fair and impartial jury has been selected for the defendant's trial. The mere expression of a predetermined opinion regarding guilt during voir dire does not disqualify a juror per se. A potential juror should be excused for cause if that juror is unable to set aside preconceptions and render an impartial verdict. Determination of a juror's qualifications must be based upon the whole voir dire examination; "single isolated responses are not determinative." *Darby,* 1996 SD 127, ¶ 34, 556 N.W.2d at 320 (citing *Hansen,* 407 N.W.2d at 220). In determining whether a prospective juror should be excluded for cause, the United States Supreme Court has applied the following standard: Would the individual's views " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath[?]' " *Rhines,* 1996 SD 55, ¶ 44, 548 N.W.2d at 430–31 (quoting *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851–52 (1985)).

[¶ 31.] Moeller contends that written answers to jury questionnaires and voir dire responses of prospective jurors Raftery, Deschamp, Kinniburgh, Drabek and Traphagen all indicated a strong propensity to automatically impose the death penalty. He additionally argues that subsequent attempts to rehabilitate those individuals gave the judge an erroneous basis to deny the challenge for cause. State responds that such responses were elicited when the defense showed gruesome pictures of the crime scene to the venirepersons before asking them for an opinion.

---

**6.** Although he claims that he was forced to use four peremptory challenges on prospective jurors who should have been excused for statutory cause, in actuality one of those jurors was excused by the court, and Moeller did not use a peremptory challenge on that potential juror. After being passed for cause, potential juror Mueller was excused by the court based on statements she made outside of court to one of State's attorneys. Because she was excused by the court, she was not among the 56 panelists selected. Therefore, contrary to the claims in Moeller's brief, we need not consider whether she showed actual bias in violation of SDCL 23A–20–12.

Also, State contends that the defense did not adequately explain the bifurcated procedure in a capital murder case, therefore the potential jurors' responses were based on incomplete information. After reviewing the complete transcript of each voir dire, we agree.

*Raftery*

[¶ 32.] With Raftery, the defense first showed pictures of Becky's body at the crime scene and before the autopsy was conducted. Defense counsel then asked him whether, even after viewing the pictures, he could be impartial; Raftery responded in the affirmative. Counsel next moved the voir dire onto the topic of the death penalty. When asked what types of crimes would warrant the death penalty, Raftery responded, "Well, the crimes involved in this case would be a good example." Without first explaining the bifurcated structure of the case, Moeller's counsel then asked:

Q: Beyond a reasonable doubt you were satisfied they committed this crime, would you be strongly inclined at the time that you get to make a judgment about penalty to give them the death penalty?

A: I would vote for the death penalty.

Q: Even if you had the alternative of life?

A: Yes.

. . . .

Q: If somebody told you not to feel the way you felt, in other words, you know, you've heard a lot in here about, well, if the Judge is going to order you to do this and instruct you to do this, you realize that's kind of a fallacy in a way. You just can't tell somebody to stop feeling something.

A: Right. Because it's America and we all have opinions.

Q: Right. And your opinion here wouldn't be changed just by somebody telling you to change it.

A: No.

[¶ 33.] Based on these responses, Moeller's counsel challenged Raftery for cause. State responded with the following explanation of the sentencing phase:

Q. I want to follow up on some questions Mr. Butler asked you. And I'm not sure the process was entirely clear. I'll walk you through the process and ask you some follow-up questions. Let's assume for the sake of argument you find the defendant guilty beyond a reasonable doubt of first degree murder. Okay? Then you come back in for a sentencing hearing, kind of a mini-trial, so to speak. It would be a second trial or hearing. And at that hearing the purpose would be to determine what the sentence is. Okay. The law in the State of South Dakota and in the United States does not allow a juror after they've reached the guilty verdict to come in here at that sentencing hearing and say to themselves, well, I don't care what evidence is presented at the sentencing hearing, I want to sentence this person to life, the heck with the evidence at the sentencing hearing. Okay. That's rule number one. And the Judge would give you that rule if you were selected as a juror in this case. All right? So you would be required under the law to keep an open mind at the sentencing hearing and listen to all the evidence that was presented at the sentencing hearing, and then only after you heard all the evidence at the sentencing hearing you go back and make a determination what the sentence should be. Now, at this sentencing hearing you can count on the fact that I would stand before you and I would argue this is one of those special types of murder under South Dakota law which is subject to the death penalty. And I have to prove that to you beyond a reasonable doubt that this is one of those special classes or categories of murders. Okay. Then the defendant, if he wanted to, he doesn't have to, but in addition to all the evidence you may have heard at the original trial the

defendant could present additional evidence at the sentencing hearing. For instance, in some cases a defendant may stand up and argue or his attorney may argue. Please take into account the fact that my client was fourteen or fifteen when this murder happened. Can you take that into account? Or maybe they'll say, please take into account the fact that my client had a mental defect at the time this happened and was really affected mentally and wasn't in the right frame of mind, please take that into account. Or they may say, please take into account the history that my client has had to endure, let's talk about the terrible family life that this person went through and let's talk about the circumstances under which they were brought up. Hopeless environment. Let's talk about that. Please take that into account. Okay? Defendant doesn't have to present any evidence like that, I don't want to mislead you. But he could, okay? And you would be sitting here as a juror and you would be required under the law to consider any evidence that was put forward at that sentencing hearing. Okay. And the law would not permit you to make up your mind on what the sentence should be until after you've heard all of the evidence and after you've considered all of the evidence fairly and then go back and, if we meet our burden that this is one of those special types of cases, and after you've considered all the evidence, then you would be permitted to impose the penalty of death. Okay? You follow that process the way it's set out?

A. Yah.

[¶ 34.] After giving that explanation, Raftery indicated that he would be able to listen to all the evidence, follow the judge's instructions as to the sentencing phase, and not lean either way until he had been presented with everything.

*Deschamp*

[¶ 35.] A similar questioning process occurred with Deschamp. Defense counsel's explanation of the sentencing phase was thus:

Q. For our discussion purposes let's say that you found Mr. Moeller guilty of the rape and murder of this nine year old girl. And then the government at a separate hearing, that would be after the determination of guilt, would then come forward and say this is a special kind of case under South Dakota law that makes the punishment of death a possibility. You'd have two choices. Life with no parole or death by lethal injection. Given the strength of your feelings about the crime of rape, obviously very strong feelings and no doubt shared by many people, and this is a murder case, if you got to that point and there was two options available to you and you already found Mr. Moeller guilty, would you be strongly inclined or leaning heavily toward a penalty of death at that point?

. . . .

Q. If you got to the point where you had to determine what the appropriate punishment was, and of course Judge Rusch can't say vote that way or vote that way, the attorneys can come before you and argue to you or try to persuade you. And what I'm trying to determine, and if I'm misreading you please correct me, but I know how strongly you feel about rape because we've talked about it here. And that given the type of allegations here would you be strongly leaning toward a punishment of death if you were to find my client guilty?

A. Yes. If the evidence say so, yes. Yes.

[¶ 36.] The defense also challenged Deschamp for cause, and State presented an explanation similar to that given to Raftery. After a thorough description of the process, Deschamp stated that he would be able to take all evidence into account and would listen to the judge's instructions before making a decision as to life or death.

*Kinniburgh*

[¶ 37.] After Kinniburgh gave seemingly conflicting answers to the defense and State's questions, the court questioned her:

Q: Ms. Kinniburgh, I – let me ask you a couple of questions, if I may.

A: Okay.

Q: It felt like I heard you saying opposite things there.  I –

A: Right.

Q: And I need to clarify that.  Because, you very clearly told Mr. Butler that, you know, once you were convinced that this defendant was guilty that you would feel that there was really no other option that you would consider other than the death penalty.

A: Right.

Q: And yet I heard you saying to Mr. Abdallah that you would fairly consider these other options.

A: Yeah.

Q: Now, I don't have any – you know, it doesn't matter to me which of those it is, but I need to know –

A: I guess I didn't understand the additional evidence at the sentencing hearing.  I mean, I – I would have an open mind in considering that additional evidence before – all of the evidence before making a final decision.

Q: Okay. Do you feel then considering the strong feelings you have got about in favor of the death penalty that that's a realistic option, that you could really sincerely consider that other evidence, or would you go into that with a preconceived idea that you were going to impose the death penalty?

A: Open mind.

Q: Okay. Based on that I am going to deny [the defense's] challenge.

*Drabek*

[¶ 38.] After the defense ostensibly explained the sentencing phase, it asked Drabek whether she would automatically impose the death penalty.  In response, she specifically asked for more clarifying information about the sentencing phase: "Are you supposed to have, if it came to that, is there something you're supposed to base your decision on with those?"

[¶ 39.] Later, State gave a thorough, easily understood explanation of the sentencing phase, after which the following exchange took place:

Q: Okay. And I guess the question that we need to know is, would you be willing as a juror to keep an open mind until you've heard all of the evidence at the sentencing phase before you made up your mind or would you just go into sentencing and say, I'm automatically going to sentence this person to death?

A: I didn't realize, I guess – I guess the way you explained it that I just, that's what I was trying to ask when, you know, when he's convicted if he's convicted guilty without a reasonable doubt in your mind after evidence that you have these two choices and that was it, that's the end.  I didn't realize that they could come off saying maybe this person has had, was abused or ——

Q: Right. Exactly.

A: —— or to any of that degree.

Q: And they could if they wanted to, present that kind of evidence.  What Mr. Gienapp wanted to ask you, would you be willing to listen to that type of evidence if it was presented, keep an open mind and after hearing all the evidence then make a decision as to whether or not to impose the death penalty or impose life in prison.

A: Yes.

Q: Could keep an open mind.

A: Um-hum. (Affirmative response.)

Q: Your Honor, we would resist the challenge.

THE COURT: Ms. Drabek, I just want to ask you a question to make sure I understand it.  Are you indicating that you would follow the Court's instructions and in making that decision about whether to impose the death penalty you

would fully consider the evidence on both sides and you're not preconceived that you would automatically impose the death penalty?

A: Yah. Because I guess when I was trying to ask him I thought that once he's, if somebody was convicted and you saw it that way you wouldn't say they were guilty unless you thought they were guilty from the evidence, so I just felt like at that point here's your choices, this is what is going to happen to this person, either it will be life without parole or death, that's it. Those were our choices at that point. I didn't realize that it would go on and you would hear an argument or [sic] either way of which way you should go with it.

THE COURT: Okay. But all you're saying is you would be willing to consider that?

A: Right.

THE COURT: You're not automatically committing to the death ——

A: No. I thought that was the point we'd make our decision.

*Traphagen*

[¶ 40.] Even after viewing the pictures of the victim, and after an incomplete description of the bifurcated guilt/penalty process, panelist Traphagen still did not express a strong propensity to automatically invoke the death penalty. Consistent with the answers on her questionnaire, Traphagen began her discussion of the death penalty with the general statement that although she thought it should be mandatory in cases involving the murder of children, even in those cases there are extenuating circumstances that should be considered. After the most cursory explanation of the bifurcated process by the defense, Traphagen further opined that if someone was "not in their mind" when they committed a crime, then perhaps the death penalty would not be warranted.

[¶ 41.] After a lengthy questioning by the defense, and apparently in response to the impression that she was not being understood, Traphagen stated:

Perhaps it would help – can I say something? My opinion, and I've thought about it a lot ... my opinion on the death penalty, because I've never been close to a case where there's been a crime, I've never been close to anything personally where there's been a violent crime against someone, so everything that I have to draw on is what I would feel if it were committed against me or my family. And that's where I find my opinion. If something were against me, if something were against my family, my child, that's how I would feel. Since it would not particularly be, in this case isn't anybody that I've even heard of, anybody I've ever known, you'd have to sit and listen to everything either way because it didn't happen to me. . . . If something were to happen to my child what I would want to happen to that person. And I know that's not right or wrong but that's how I feel and why I feel that way. So, yes, I would have to sit and listen to every side. I would have to sit and listen to and be open-minded and say, you know, if you say that life imprisonment is the best for this man, if he's been convicted of a crime, if all the evidence indicates that he's guilty and then you say prosecution says the death penalty is in order, you have to listen to the other side and for any particular reason, you know, and you have to listen to both sides and go on that evidence which you should go. Because, like I say, it's not – it's not personal against me so I can't say that yes, they deserve to die, when I've based my opinion and my feelings on like anything if it happened to me. So you would have to listen to both sides and be open to both sides because it's not personally against me.

. . . .

But you would have to listen to both arguments, you know, and if it goes into sentencing stage you at that point and to

my knowledge at this point you have to listen to both sides and take everything in account and find if that's the best, the best punishment.

[¶ 42.] Despite Moeller's assertions to the contrary, this spontaneous, insightful oration shows that Traphagen did not harbor a strong propensity to automatically invoke the death penalty.

[¶ 43.] In sum, we do not find an indication that any of the five challenged jurors possessed strong inclination in favor of the death penalty. Moeller is correct when he states that "[a] search for qualified jurors should not be a ping pong game." This ping pong approach to qualifying potential jurors could be avoided through the use of complete, accurate information about the entire trial process. The trial court did not abuse its discretion in denying Moeller's challenges for cause for these five venirepersons, and there was no violation of his constitutional right to an impartial jury.

[¶ 44.] Similarly, we find no statutory violation[7] in denying Moeller's challenge for cause to the other jurors. He contends that panelist Scott indicated she would require the defendant to carry the burden of proof. This is contradicted by a full review of the entire voir dire which, like those jurors previously discussed, shows that Scott's response was based on an incomplete understanding of the penalty phase and which side had the burden of proof. After an explanation by State, and upon further questioning by the trial court, Scott indicated that she would follow the court's instruction and would not impose

an obligation upon the defendant to present evidence in mitigation.

[¶ 45.] Moos was another panelist who gave an answer based on incomplete information. In response to a question by the defense, she indicated that she would not consider a life sentence once the defendant had been found guilty of aggravated murder. However, the record reveals that the defense had not adequately explained the sentencing phase of the trial before asking the question. Once State explained the process to her, and the trial court followed up with further questioning to clarify her position, Moos stated that she would be able to consider all factors before deciding on a sentence of death or life in prison. When asked to explain her seemingly contradictory answers, Moos stated that her answers on the questionnaire and those given to the defense no longer correctly reflected her views, because she had been "enlightened on how the system works."

[¶ 46.] Finally, as noted by the trial court, panelist Hiland was "obviously a very gruff individual" as reflected in his responses to the defense's voir dire questions. However, there was nothing in the record that indicated he possessed any animosity toward the defendant. In fact, he stated several times that he would keep an open mind and his decision would be based upon the evidence.

[¶ 47.] A determination of a juror's qualifications must be based upon the whole voir dire examination, not upon "single isolated responses." *Darby*, 1996 SD 127, ¶ 34, 556 N.W.2d at 320. A review of the complete voir dire transcript shows that the trial court did not abuse its discre-

---

**7.** Moeller cites SDCL 15–14–6(6) and (7) as authority for a showing of a statutory inability to serve. That statute pertains to civil juries. The statute in effect at the time of trial governing challenges for cause in a criminal case was SDCL 23A–20–12, which provided in pertinent part:

A specific challenge for cause is that a juror is disqualified from serving in the case on trial because of:

(1) Implied bias; or

(2) Actual bias.

Actual bias is the existence of a state of mind on the part of a juror, in reference to the case or to either party, which satisfies the court, in the exercise of sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging. SDCL 23A–20–12 has since been repealed. SL 1999 ch. 285.

tion in denying Moeller's challenges for cause, because it has not been shown there were any constitutional or statutory violations of his right to an impartial jury.[8]

## ISSUE 4.

[¶ 48.] **The trial court did not abuse its discretion in sustaining certain prosecution objections to voir dire by defense counsel.**

### Facts

[¶ 49.] During the voir dire process, Moeller's counsel attempted to ask potential jurors whether they could vote for life imprisonment without parole where the defense did not introduce any evidence in mitigation at the sentencing phase. State objected to each of these questions, claiming that it required the venireperson to speculate. The court sustained the objections. On appeal, Moeller contends that was an abuse of discretion. He argues that such questions were merely an attempt to determine whether the potential juror could vote for life imprisonment if the defense did not introduce any evidence in mitigation. He posits that the prosecution was allowed to ask hypothetical and speculative questions related to potential mitigation testimony that might be introduced by the defense.

### Decision

[¶ 50.] Counsel is allowed reasonable latitude in questioning prospective jurors. *Smith*, 477 N.W.2d at 33 n. 4; *Miller*, 429 N.W.2d at 38. Moreover, hypothetical probing of jurors' attitudes

toward evidence is permitted. *Id.* "While prospective jurors may not be questioned with respect to hypothetical sets of facts expected to be proved at trial, thus committing them to a decision in advance, they may be subjected to hypothetical questions about their mental attitude toward certain types of evidence." *Miller*, 429 N.W.2d at 38 (citing *Hobbs v. State*, 277 Ark. 271, 641 S.W.2d 9, 12 (1982)).

[¶ 51.] A review of the voir dire transcripts reveals that the questions posed by the defense were in fact an attempt to get potential jurors to prejudge the case, whereas the hypothetical questions asked by State had no relationship to any facts at issue in the trial and were merely given to explain the legal process. A typical example of the type of questions posed by the defense are shown by the questions asked of potential juror Moos:

Q: Now, Mr. Abdallah talked to you about the fact that the defense could put evidence on in mitigation and you indicated that you would consider that?

A: Right. New evidence.

Q: Well, it wouldn't be new evidence.

A: Well.

Q: But there is no burden on the defense to do that.

A: Right.

Q: What if the defense didn't do that?

Mr. Abdallah: I would object, your Honor. Asking her to speculate.

The Court: Sustained.

Q: You understand that the defense does not have to put on mitigation?

---

8. We find no just cause that would have warranted the removal of any of the challenged jurors. However, were we to find the trial court erred in failing to remove a potential juror for cause, we would still reject Moeller's argument that the failure to remove the challenged jurors forced him to exhaust his peremptory challenges. The United States Supreme Court recently held that if a defendant elects to cure the erroneous refusal of a trial judge to dismiss a potential juror for cause by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any right under the Federal Rules of Criminal Procedure or the Constitution. *United States v. Martinez–Salazar*, 528 U.S. ——, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). *But see State v. Etzkorn*, 1996 SD 99, 552 N.W.2d 824 (reversing and remanding a DUI conviction where: (1) the court erroneously refused to remove two jurors for cause; (2) Etzkorn exhausted his peremptory challenges removing the two incompetent jurors; and (3) Etzkorn alleged on appeal the names of several jurors he would have removed using his peremptories had he not exhausted his peremptories on the two incompetent jurors).

A: Right.

Q: Then when Mr. Abdallah was talking to you he was saying that you'd be considering this mitigation that the defense put on and you responded yes, I'd consider that before making a decision.

A: Right.

Q: Right. What if you had nothing to consider?

Mr. Abdallah: Same objection, your Honor.

The Court: Sustain that objection.

[¶ 52.] In comparison, State's hypotheticals were used to explain the application of the law and the procedure used at the sentencing phase. *See* voir dire of potential juror Raftery, *supra*, Issue 3 ¶ 33.

[¶ 53.] Although it is acceptable to use hypothetical fact situations to explain a legal concept or its application, it is improper to then ask potential jurors how they would respond to the hypothetical situation once given. Herein lies the difference between what Moeller's counsel did and what State did. It was proper for State to use the hypothetical concept of a mental defect or a 15–year–old person to explain the concept of a mitigating factor. However, it would have been improper for it to then ask the potential juror whether he would impose a life sentence or death based upon that hypothetical, especially if those were truly the facts of the case. Such a question would be akin to "staking out" the potential juror's responses, and that is not permitted. *See generally* Annotation, *Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case*, 99 A.L.R.2d 7, § 4 (Later Case Service 1993).

[¶ 54.] When the defense asked the potential jurors whether they could vote for life imprisonment where there was no evidence in mitigation presented, it was an attempt to get a prejudgment from the jurors. An objection to such a question was proper, and the trial court did not

abuse its discretion in sustaining such an objection.

## ISSUE 5.

[¶ 55.] **The trial court did not abuse its discretion in allowing State to offer into evidence results of APO–B DNA typing done at its request by an expert working for both sides.**

### Facts

[¶ 56.] In 1990, prior to the first trial, State sent swabs and blood samples to Dr. Moses Schanfield, director of Analytical Genetic Testing Center (AGTC). He performed conventional serological tests and extracted DNA so that it could be sent to another lab for testing. At the time AGTC was not conducting DNA testing. It developed capabilities to do so sometime shortly thereafter.

[¶ 57.] On January 24, 1992, Moeller filed a motion to appoint Dr. Schanfield as an expert for the defense "for the purpose of conducting forensic DNA testing in the instant case and review and replication of those tests conducted at the direction of the State of South Dakota in the instant case." A hearing was held the same day. The exchange was as follows:

The Court: I did want to talk about defendant's expert witnesses. How are we going on that, Mr. Butler?

Mr. Butler: I do have an order today along with the affidavit regarding – if I may approach the Bench?

The Court: Yes, do so.

Mr. Butler: From the Genetic Testing Institute as it concerns the additional tests.... It's my understanding, again talking to Mr. Masten, we should not encounter any difficulty in formally agreeing to what needs to be submitted to Mr. Schanfield.... Mr. Masten indicated it might be advisable to discuss or point out for the Court that I have discussed this particular point with my client and he is in agreement with the decisions I'm making at least as to seeking the expertise.

The Court: Is that true, Mr. Moeller?

Mr. Moeller: Yes.

. . . .

Mr. Masten: One issue that I just wanted in the record, Your Honor. The Court might want to inquire of Mr. Moeller in regard to the defense's expert Mr. Schanfield. Mr. Butler – I made Mr. Butler aware when we had one of these telephone discussions when he was looking for an expert, it came up just because I remembered the name, the State of South Dakota as part of the investigation in this case submitted some samples, two of the sperm samples, to Dr. Schanfield's lab in I believe it was 1990 for advance testing using some enzyme technique. So Dr. Schanfield's lab had our samples and did testing for us in 1990 and they are proposing to hire him now as a defense expert. I don't have a problem with that, but I did want it in the record so that if there was ever a habeas proceeding and it came out that the State and the defense both used the same laboratory we couldn't be accused of double dealing.

The Court: Mr. Butler had mentioned that to me earlier. It was off of the record but I assumed that would get in the record at some point in time in these proceedings.

Mr. Butler: The other point I would make, Your Honor, I fully disclosed all of that to Mr. Moeller, he is fully apprised of it. And I discussed that very thing with Mr. Schanfield, he did not perceive that as a conflict. And I did a preliminary discussion with the Court and the Court did not and I do not perceive it. So therefore I hope we have resolved that matter.

The court signed an order appointing Schanfield as a defense expert "for the purpose of conducting and replicating certain DNA tests."

[¶ 58.] On May 1, 1992, Schanfield received defense samples. At the direction of the defense, DNA was extracted but no tests were conducted. The decision not to conduct any DNA tests on its samples was a strategic choice by the defense. One month later on June 12, 1992, Schanfield testified for State at the *Frye* hearing [9] on the issue of the admissibility of DNA PCR-based testing of the DQ-alpha marker.

[¶ 59.] After testifying at the *Frye* hearing, Schanfield approached State and informed it that his lab had developed the capability to conduct PCR-based APO–B typing. State sent a letter to the defense on June 17, 1992, asking whether they intended to pursue the APO–B testing with Schanfield. According to Moeller's attorney, he responded to the letter by indicating that the inquiry was premature because the trial court had not yet issued a decision from the *Frye* hearing on whether to admit any PCR-based typing. Additionally, counsel indicated that he wished to review Schanfield's validation studies prior to his deciding whether to pursue such testing. He claims he did not receive Schanfield's validation studies, but instead received only an article about APO–B typing.

[¶ 60.] After receiving no indication from the defense that it intended to pursue the APO–B typing with Schanfield, State directed him to conduct the tests on State samples. The results failed to exclude Moeller as a possible semen donor. On August 17, 1992, approximately two weeks into Moeller's first trial, State filed an offer of proof seeking to introduce its evidence of PCR-based APO–B typing. A hearing was held the same day. The defense objected to the introduction of such evidence, asserting that it was untimely offered and that a *Frye* hearing was necessary in order to determine its admissibility. The trial court denied the State's offer of proof, and the APO–B evidence was not admitted at the first trial.

9. *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923) (holding that in order for expert scientific testimony to be admissible, it must be "generally accepted" as reliable in the relevant scientific community).

[¶ 61.] Prior to the second trial, State filed a motion to introduce Schanfield's APO–B evidence. In response, the defense filed a motion to prohibit the introduction of such evidence on the grounds of prosecutorial misconduct. The motion alleged that "without knowledge or approval of the Defendant, Schanfield informed [State] that his laboratory was purportedly capable of conducting a new DNA typing procedure known as APO–B." It further alleged that State and Schanfield acted in collusion by conducting APO–B typing without informing the defense. Moeller argued that even though the defense did not have Schanfield conduct any DNA testing, or have the APO–B typing procedure done, Schanfield still did not have authority to make such services available to State without his knowledge or permission.

[¶ 62.] After a hearing the trial court entered an order denying the defendant's motion to suppress. Moeller appeals, arguing that the inclusion of Schanfield's APO–B tests violated his attorney-client privilege, his Sixth Amendment right to effective counsel, and his Fifth Amendment rights to due process and protection against self-incrimination, as well as his similar rights under the South Dakota Constitution.

### Decision

[¶ 63.] There is considerable conflict of authority as to under what circumstances an expert witness retained by one party will be allowed to testify upon request of the other party. *State Highway Comm'n v. Earl*, 82 S.D. 139, 142, 143 N.W.2d 88, 89 (1966). In *Earl*, after surveying other jurisdictions' treatment of similar situations, we declined to extend the attorney-client privilege to cover the services of a real estate appraiser who had first completed an appraisal for the defendant, and who was later called to testify by the plaintiff. We reasoned that "[t]he mere fact the expert may have communicated his opinion of value to either the attorney or client does not make it a privileged communication." *Id.* at 147, 143 N.W.2d at 92.

[¶ 64.] Moeller cites *Hutchinson v. People*, 742 P.2d 875 (Colo.1987), in support of his position. There, the Colorado Supreme Court held that the prosecution's use of a defense expert in its case-in-chief, in the absence of a waiver, violated the defendant's right to effective assistance of counsel. (The defendant had retained a handwriting analyst, but decided not to use him at trial. The prosecution then subpoenaed him to testify as to his conclusions regarding similarities between the defendant's handwriting and the handwriting on a vital piece of evidence that inculpated the defendant.) In reaching its decision, the court reasoned that the prosecution should not be allowed to intrude into the confidential relationship between a defendant and his expert.

[¶ 65.] In response, State directs our attention to *State v. McDaniel*, 485 N.W.2d 630 (Iowa 1992), wherein the Iowa Supreme Court held that the prosecution's retainment of a psychiatrist who had initially conducted an examination on behalf of the defendant was permissible. It reasoned that the physician-patient privilege was not invoked in cases where a psychiatrist was appointed and paid for by the state. Further, it found there to be no attempt to secure privileged information from the psychiatrist, stating that by holding otherwise "a criminal defendant could block the State from the testimony of likely experts by procuring as many examinations from as many experts as possible." *Id.* at 633.

[¶ 66.] Another case more directly on point than either *Hutchinson* or *McDaniel* is *State v. Bockorny*, 125 Or.App. 479, 866 P.2d 1230 (1993), where the defendant retained an expert to testify whether material found on a pair of scissors was blood. The defense also discussed other issues with the expert, but decided not to have him testify as to those aspects of the case. Before the expert testified, the prosecution contacted him concerning his anticipated testimony about the scissors. During the conversation, the prosecutor also asked the expert about a certain analysis method

that was unrelated to the scissors. The expert later contacted the prosecution and offered to testify as to the analysis method, and the prosecution accepted. Consequently, the expert testified for the defense regarding the scissors and for the prosecution regarding the unrelated analysis method. The defendant was ultimately convicted of the crimes charged.

[¶ 67.] On appeal, the *Bockorny* court stated: "There is no dispute that, if an expert is willing to give opinions to both sides, a litigant can be placed in a difficult, if not impossible, situation at trial. However, it is not a situation prohibited by law." *Id.* at 1235. It reasoned that since the expert consulted with the respective parties on unrelated aspects of the case, and there was no evidence that he shared confidential information with the other side, no attorney-client or work product privilege had been violated.

[¶ 68.] After considering the applicable legal principles, we are persuaded that the trial did not abuse its discretion in allowing in Schanfield's testimony concerning APO–B evidence. Here, Moeller's assertion of error boils down to an allegation that Schanfield should not have told the prosecution that he had developed the capability to conduct APO–B typing. We see no violation of the attorney-client privilege in such a communication, especially when it relates merely to general developments in technology.

[¶ 69.] Moreover, we do not accept the logic of Moeller's argument that the State had only retained Schanfield for preliminary serology work and that his DNA services were reserved to the defense. Indeed, at the time State utilized Schanfield's services in 1990, his lab did not yet have the capability to conduct any forensic DNA analysis. That is why he was not retained as a State DNA expert. Similarly, at the time he was retained by the defense as a DNA expert, he had acquired DNA DQ-alpha typing capabilities, but he had not yet begun conducting APO–B typing. We agree with the trial court's apt observations:

It is somewhat disingenuous for Moeller to argue that he knew that AGTC had been hired to do [only] serological work and didn't anticipate that AGTC would do DNA work for the State because he knew that a relationship with the State existed. The same reasoning could be used to argue that AGTC had been hired by the Defense to do DQ-alpha testing and that the State had no way of knowing that the Defense was interested in APO–B testing. It is unrealistic to attempt to draw such narrow lines holding that an expert can be employed for one purpose and one purpose only and can talk to that party that hired him only about that narrow topic while talking to the other party only about the narrow topic for which they hired him.

. . . .

... [I]f the court is to impose an absolute prohibition on communications by counsel with an expert who has already been employed by the other party, then the Defense had no business talking to AGTC in the first place. If the facts were different in this case, either in that there was revelation of defense communications to the expert, or if the expert had first been retained by the defense, the court would have no concerns with suppressing these test results, but given the actual facts, there is no justification for doing that.

[¶ 70.] There was no abuse of discretion in admitting Schanfield's expert testimony, because both sides were aware that he was performing work for the other side. While we do not condone such practice by any witness, we see no prejudice.

## ISSUE 6.

[¶ 71.] **The trial court did not abuse its discretion in admitting a belated report by State's soil expert, and in failing to conduct a *Daubert* admissibility hearing on the soil expert's testimony.**

### Facts

[¶ 72.] In *Moeller I*, John Wehrenberg, a retired professor of geology who specializ-

es in forensic examinations of soils, submitted a report dated May 9, 1991, concluding that a soil sample taken from the left front fender of Moeller's pickup was so similar in many ways to soil taken from the crime scene that the two soils could have had the same place of origin. Among the minerals identified in both locations was one called gahnite.

[¶ 73.] Wehrenberg submitted a second letter dated April 7, 1997, to State regarding gahnite, concluding that the mineral was "very rare." This letter was faxed to Moeller's counsel the next day. Counsel filed a motion in limine on April 28, 1997, seeking to prevent the introduction of Wehrenberg's conclusions embodied in the April 1997 letter, arguing that the letter contained new conclusions not previously seen. In addition, they contended that the letter was untimely and its late disclosure did not give them adequate time to determine the accuracy of the conclusion that the mineral in question was indeed gahnite.

[¶ 74.] A hearing on the motion was held on Thursday, May 1, 1997. In addition to the points presented in the motion, Moeller's counsel raised the argument that a *Daubert* hearing should be conducted regarding the method of analysis Wehrenberg performed on the soil sample. After hearing counsel's arguments, the court denied the motion, finding that the only information added by the April 1997 letter was Wehrenberg's opinion on the rarity of gahnite. The court ordered State to make Wehrenberg available to Moeller's expert over the weekend, (prior to his taking the witness stand the following Monday), in order to answer any questions the defense had about the April 1997 letter. On Monday, May 5, 1997, Wehrenberg testified as to his opinions concerning a comparison of the soils at the crime scene and on Moeller's pickup, and regarding gahnite. Moeller's counsel requested and received a standing objection to such testimony.

[¶ 75.] On appeal, Moeller argues that the admission of Wehrenberg's belated April 1997 letter opining on the rarity of gahnite, as well as his testimony to that effect, was an abuse of discretion. He asserts that the late disclosure of the report prohibited testing by his soil expert to determine whether the mineral in question was indeed gahnite. Additionally, he contends that a *Daubert* hearing was necessary to determine whether the reasoning or methodology underlying Wehrenberg's testimony was scientifically valid and admissible. Because the trial court did not order State to conduct tests to conclusively identify the mineral, or allow the defense time to test the mineral itself, or conduct a *Daubert* hearing, Moeller argues that such evidence should be excluded.

### Decision

#### i. Admission of the belated report

[¶ 76.] In *State v. Sahlie,* 90 S.D. 682, 687, 245 N.W.2d 476, 478–79 (1976), we stated that "[d]ue process cannot be satisfied unless the defendant is provided some opportunity to examine possible exculpatory evidence long enough before trial so as to have at least an opportunity to determine if such evidence is or is not exculpatory." The *Sahlie* holding was later modified to the extent that omission or belated disclosure was no longer, without exception, prejudicial error. *State v. Reiman,* 284 N.W.2d 860, 870 (S.D.1979). Now, in order to find error, the defendant must establish that the belated disclosure of evidence was material to the issue of guilt, *Reiman,* 284 N.W.2d at 869, because if it was not material, it could not be violative of due process. *Id.* (citations omitted). This rule applies to both inculpatory and exculpatory evidence.

[¶ 77.] Both parties are in agreement about the rarity of gahnite; Wehrenberg characterized it as a "very rare" mineral, and Perry Rahn, Moeller's soil expert, described it as "extremely rare.... Gold is more common than gahnite." Therefore whether gahnite was indeed found in both the wheel well of Moeller's pickup and at the crime scene was a strong piece of

circumstantial evidence and material to the issue of guilt.

[¶ 78.] The issue of materiality aside, Moeller's claim, that the late disclosure of the April 1997 report prohibited testing by his soil expert to determine whether the mineral in question was indeed gahnite, is unfounded. Gahnite was mentioned in the May 1991 report at least twice,[10] and it was also characterized at the first trial as being a mineral of "substantial interest" to Wehrenberg when he testified in State's case-in-chief.[11] Both the 1991 report and Wehrenberg's testimony at the first trial placed Moeller on notice that gahnite had been identified as a possible piece of evidence linking him to the crime scene.

[¶ 79.] " '[W]e do not equate late disclosure with suppression, especially where, as here the trial record indicates that defense counsel made use of the information at trial.' " *State v. Knecht*, 1997 SD 53, ¶ 21, 563 N.W.2d 413, 421 (quoting *State v. Fox*, 313 N.W.2d 38, 40 (S.D.1981) (citation omitted)). The trial court did not abuse its discretion in admitting the April 1997 report.

ii. *Allowing Wehrenberg to testify without first conducting a* Daubert *hearing.*

[¶ 80.] Moeller also contends that a *Daubert* hearing was necessary to determine whether the reasoning or methodology underlying Wehrenberg's testimony was scientifically valid and admissible, and that the failure to conduct such a hearing violated his due process rights. Specifically, Moeller challenges the soil sample collection methodology and the visual inspection method of analysis used by Wehrenberg to identify the mineral in question as gahnite.

[¶ 81.] Prior to Wehrenberg's testimony, defense counsel orally requested a *Daubert* hearing. The court denied the motion, stating that in its view the *Daubert* standard was somewhat more liberal than the *Frye* standard. The court further found Wehrenberg's testimony and report admissible "based upon the qualifications that he's shown and the ruling of the Supreme Court already in regard to the evidence tendered by him." [12] However, the court did grant Moeller a continuing objection.

[¶ 82.] SDCL 19-9-7 and Rule 104(a) of the Federal Rules of Evidence provide in pertinent part: "Preliminary questions concerning the qualification of a person to be a witness ... shall be determined by the court...." In *Daubert*, the Supreme Court mandated that judges, when faced with a proffer of expert scientific testimony, conduct a "gatekeeping" preliminary evaluation to determine whether the proffered testimony is allowable. 509 U.S. at

---

10. The report described one particular grain of soil as, "well rounded, polished brown-black, high index, under microscope isotropic, gahnite (?)." It also described another sample particle as "black rounded glassy grain, probably high index, may be a spinel." According to testimony of both Wehrenberg and Rahn, gahnite is a member of the spinel group of minerals. Later in the report, when comparing soil from the left fender wells to soil from the crime scene, Wehrenberg reported that he identified "Gahnite" in the left front fender well and in two crime scene samples.

11. There the testimony was as follows:
   Q: When you take out the minerals that are ... common to any place east of the Rockies and one would expect to find anywhere in South Dakota how many points of comparison were there that were of substantial interest to you?
   A: Well, in terms of the mineral grains themselves there was, certainly with the hornblende was the significant one, the rutile, biotite, there is a mineral that I have tentatively identified as gahnite which is a rather rare mineral which I found in both samples. And that, that gahnite could conceivably be an individuating mineral if I knew more about the distribution of gahnite in this region....

12. In *Moeller I*, we held that the trial court did not abuse its discretion in permitting Wehrenberg to testify. We found Moeller's contention that such testimony lacked any scientific conclusion went to the weight of the evidence, not to its admissibility. *Moeller I*, 1996 SD 60, ¶ 92, 548 N.W.2d at 486.

597, 113 S.Ct. at 2798–99, 125 L.Ed.2d at 485.

[¶ 83.] Complementing SDCL 19–9–7 and Rule 104(a) are SDCL 19–9–9 and Rule 104(c), which further provide that "[h]earings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require or, when an accused is a witness, if he so requests." *See also, United States v. McVeigh,* 955 F.Supp. 1278, 1279 (D.Colo. 1997), *aff'd, United States v. Nichols,* 169 F.3d 1255 (10thCir.1999), *cert. denied, Nichols v. United States,* —— U.S. ——, 120 S.Ct. 336, 145 L.Ed.2d 262 (1999); 60 Am.Jur.Trials *The Daubert Challenge to the Admissibility of Scientific Evidence* § 25 (1996) [hereinafter The *Daubert* Challenge] (stating that whether a hearing is required outside the presence of a jury depends upon whether it is required in the interests of justice).

[¶ 84.] We have never had occasion to interpret SDCL 19–9–9, but in federal courts, full evidentiary hearings for preliminary Rule 104 assessments are not routinely used. The *Daubert* Challenge, *supra,* § 27. In *United States v. Quinn,* 18 F.3d 1461, 1465 (9thCir.1994), the court rejected the defendant's argument that he was entitled to a full evidentiary hearing on the reliability of an expert's scientific process. Citing *Daubert,* the court stated, "[w]e cannot conclude that the court abused the discretion trial courts must exercise in choosing the best manner in which to determine whether scientific evidence will assist a jury." *Id.* Relying on the Ninth Circuit's decision in *Quinn,* the U.S. District Court for the District of New Jersey recently held that "the opponent of the proposed expert testimony must demonstrate a prima facie case of unreliability before an evidentiary hearing is required." *Lanni v. State of New Jersey,* 177 F.R.D. 295, 303 (D.N.J.1998). It reasoned that such a hearing was not required under *Daubert* and "would cause unnecessary expense and delay." *Id.*[13]

[¶ 85.] Recently the United States Supreme Court, in ruling that the *Daubert* reliability factors[14] are non-exclusive, granted a trial court wide latitude in determining how to test an expert's reliability. It stated:

The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether* that expert's relevant testimony is reliable. Our opinion in *Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) makes clear that a court of ap-

---

13. *See also, Hoult v. Hoult,* 57 F.3d 1, 4–5 (1st Cir.1995) (rejecting a defendant's argument that *Daubert* required the trial court to make a sua sponte, on-the-record ruling on the admissibility of expert testimony each time it is proffered, and declining to "shackle the district court with a mandatory and explicit reliability analysis," instead assuming that the trial court performs such an analysis sub silentio throughout the trial with respect to all expert testimony). *But see, Gruca v. Alpha Therapeutic Corp.,* 51 F.3d 638, 643 (7th Cir. 1995) (holding that the lower court "abdicated its responsibility under Rule 104(a) by failing to conduct a preliminary assessment of the admissibility of the plaintiff's expert testimony" before permitting the plaintiff's expert to testify, where the trial court expressly declined to rule on the defendant's challenge to the admissibility of such testimony, and in-stead directed a verdict in favor of defendants); *State v. Quattrocchi,* 681 A.2d 879, 884 (R.I.1996) (stating that a preliminary examination out of the presence of the jury is necessary in cases involving scientific evidence about repressed memories, if such evidence is challenged).

14. The Supreme Court in *Daubert* set forth a list of factors which a trial court should consider when making a reliability determination: (1) whether the theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the theory in the scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97, 125 L.Ed.2d at 482–83.

peals is to apply an abuse-of-discretion standard when it "review[s] a trial court's decision to admit or exclude expert testimony." 522 U.S. at 138–139, 118 S.Ct. 512. That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion. Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary "reliability" proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises. Indeed, the Rules seek to avoid "unjustifiable expense and delay" as part of their search for "truth" and the "jus[t] determin[ation]" of proceedings. Fed. Rule Evid. 102.

*Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 152–53, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238, 252–53 (1999) (emphasis in original).

[¶ 86.] We therefore disagree with Moeller's contention that a *Daubert* hearing for Wehrenberg's testimony was necessary. First, we note that the challenged evidence did not present any new scientific theory, and the methodologies were neither complex nor unusual. *McVeigh*, 955 F.Supp. at 1279. It is a well-established principle in the field of mineralogy that a visual analysis is an accepted method of identifying minerals. A mineralogist first uses visual inspection in studying minerals. Only when that method fails to identify a mineral should other tests be made. Edward Salisbury Dana, *Minerals and How to Study Them* 7–8, (Cornelius S. Hurlbut, Jr. rev., 3rdEd. 1962) *See also*, Richard M. Pearl, *Gems, Minerals, Crystals and Ores* 32, 49–50 (1964) (stating that there are many ways to identify minerals, depending on the observer's degree of skill; one begins by analyzing key properties such as luster, color, streak, cleavage, fracture, hardness, magnetism, and specific gravity).

[¶ 87.] Moreover, there is no evidence in the record that Wehrenberg's methodology or analysis was so skewed as to alter the otherwise reliable scientific method. "An allegation of failure to properly apply a scientific principle should provide the basis for exclusion of an expert opinion only if 'a reliable methodology was so altered . . . as to skew the methodology itself.'" *Beasley*, 102 F.3d at 1448 (quoting *Martinez*, 3 F.3d at 1198) (other citations omitted).

[¶ 88.] Because the trial court could have properly concluded that a "reliability" proceeding outside the presence of a jury was unnecessary, we find no abuse of discretion in denying Moeller's motion for a *Daubert* hearing as to the admissibility of Wehrenberg's testimony.

### ISSUE 7.

[¶ 89.] **The trial court did not abuse its discretion in denying Moeller's motion in limine regarding a forensic pathologist's report.**

#### Facts

[¶ 90.] When Moeller was arrested in 1990, a folding knife with a three-inch blade was found among his possessions in his vehicle. The knife was analyzed by State, but determined to be unhelpful. It was subsequently placed in an evidence locker and not used as evidence at the first trial.

[¶ 91.] Prior to the second trial, State began reviewing all evidence and re-discovered the knife. It was sent to Dr. Brad Randall, a forensic pathologist, who examined it on April 8, 1997. He submitted a report to State dated April 15, 1997, wherein he concluded that the knife was not inconsistent with the wounds on Becky's body. He further concluded that "the characteristics of the stab wounds were consistent with having been inflicted by a knife with a single sharp edge and a blade thickness comparable to that of the subject knife." However, the injuries could only be attributed to a class of knives "rather than any specific distin-

guishing features which would point to a definitive identity between the knife and the inflicted wounds."

[¶ 92.] The defense filed a motion in limine seeking to suppress the introduction of Randall's report. Following a hearing, the trial court denied defendant's motion. Randall's report was admitted at trial, and he was allowed to testify regarding his conclusions. Moeller's counsel cross-examined him and called its own expert witness to refute Randall's conclusions.

[¶ 93.] On appeal, Moeller argues that because there was no forensic evidence tending to connect the knife to the crime, Randall's opinion was more prejudicial than probative and should have been excluded. He further contends the report was untimely offered and therefore should have been excluded. We disagree.

### Decision

[¶ 94.] SDCL 19–15–2 guides us on the admission of expert testimony. It requires that such testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." SDCL 19–15–2; *Moeller I,* 1996 SD 60, ¶ 88, 548 N.W.2d at 485. " 'Any fact that tends to connect an accused with the commission of a crime is relevant and has probative value.' " *Moeller I,* 1996 SD 60, ¶ 88, 548 N.W.2d at 486 (quoting *State v. Johnson,* 316 N.W.2d 652, 654 (S.D.1982) (other citations omitted)). Although relevant, expert testimony may be excluded if it is more prejudicial than probative. SDCL 19–12–3. To warrant exclusion, the evidence must show "unfair prejudice." *State v. Wright,* 1999 SD 50, ¶ 16, 593 N.W.2d 792, 799. "Unfair prejudice is associated with 'facts that arouse the jury's hostility or sympathy for one side without regard to the probative value of the evidence.' " *Moeller I,* 1996 SD 60, ¶ 92, 548 N.W.2d at 486 (citation omitted).

[¶ 95.] A review of the record shows that while Randall's report could not definitive-

ly link Moeller to the crime, it was another piece of the circumstantial case that tended to connect him to the crime. *See Moeller I,* 1996 SD 60, ¶ 89, 548 N.W.2d at 486. Moeller's assertion, that an expert's testimony is not legally probative if it is based upon a mere possibility, is without merit. Such arguments go to the weight of the evidence, not its admissibility.

[¶ 96.] We cannot accept Moeller's argument that Randall's testimony in the second trial went far beyond his testimony in the first trial. First, State is not limited to evidence presented in the first trial. Next, Randall was not given the opportunity in the first trial to examine the knife and testify regarding his opinion whether it could have inflicted the wounds. It was not error to allow Randall to examine and opine about the knife.

[¶ 97.] Nor do we find reversible error in the fact that Randall's report was submitted after jury selection had commenced. As stated previously in regard to Dr. Wehrenberg's soil report, we do not equate late disclosure with suppression, especially where the defense counsel made use of the information at trial. Here, the record indicates that Moeller's counsel did an admirable job of exposing the weaknesses in Randall's testimony and report.

### ISSUE 8.

[¶ 98.] **The trial court did not err in its jury instructions defining aggravating circumstances.**

#### Facts

[¶ 99.] During the trial's sentencing phase, State presented evidence attempting to establish that Moeller's murder of Becky was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." SDCL 23A–27A–1(6).[15] The jury returned a verdict of

---

15. The statute at issue here is the 1990 version of SDCL 23A–27A–1(6), which provided

in part:

death by lethal injection, indicating that it found beyond a reasonable doubt that the offense involved all three factors of torture, depravity of mind, and an aggravated battery to the victim.

[¶ 100.] On appeal, Moeller argues that the trial court's definition of aggravating circumstance is unconstitutionally vague because it fails to channel the jury's sentencing discretion. He claims such instructions violated the cruel and unusual punishment clause of the Eighth Amendment and the due process guarantees of the Fifth and Fourteenth Amendments to the United States Constitution, as well as the companion clauses in the South Dakota Constitution.

### Decision

[¶ 101.] We review a trial court's interpretation of statutes de novo. *State v. Arguello,* 1996 SD 57, ¶ 10, 548 N.W.2d 463, 464. Regarding aggravating circumstances in capital murder cases, constitutional requirements are met when a trial court's instructions to the jury define and limit otherwise vague and overbroad statutory terms so as to adequately channel the jury's discretion. *Moeller I,* 1996 SD 60, ¶ 114, 548 N.W.2d at 491.

[¶ 102.] As we stated in *Moeller I:*

The Eighth and Fourteenth Amendments to the United States Constitution prohibit state sentencing systems that cause the death penalty to be wantonly and freakishly imposed.

If a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.

[I]n all cases for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances and any of the following aggravating circumstances which may be supported by the evidence:
(6) The offense was outrageously or wantonly vile, horrible or inhuman in that it involved

Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates standardless sentencing discretion. It must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death.

"A State's definitions of its aggravating circumstances—those circumstances that make a criminal defendant 'eligible' for the death penalty—therefore play a significant role in channeling the sentencer's discretion." To satisfy constitutional mandates, an aggravating circumstance must meet two basic requirements. First, it "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Second, "the aggravating circumstance may not be unconstitutionally vague." A challenged provision is impermissibly vague when it fails to adequately inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with open-ended discretion.

*Moeller I,* 1996 SD 60, ¶ 111, 548 N.W.2d at 489–90 (quoting *Rhines,* 1996 SD 55 ¶¶ 138–40, 548 N.W.2d at 447) (citations omitted).

*i. "Depravity of mind" definition.*

[¶ 103.] Addressing each of Moeller's arguments in turn, we first focus on the depravity of mind instruction. He asserts that the definition of "depraved mind" (Instruction No. 8) suffers from the same

torture, depravity of mind, or an aggravated battery to the victim.
In 1995 subsection (6) was amended to add the sentence, "Any murder is wantonly vile, horrible, and inhuman if the victim is less than thirteen years of age." 1995 S.D.Laws ch. 132.

unconstitutional vagueness as the instruction disapproved of in *Rhines,* 1996 SD 55, ¶¶ 137–148, 548 N.W.2d at 447–49. He claims that the instruction is "largely a compilation of subjective, pejorative phrases which, standing alone, or in combination, do not cure the vagueness so as to provide sufficient, objective guidance to the jury" on the meaning of the term. The instruction at issue defined depraved mind for the jury as follows:

### INSTRUCTION NO. 8

The jury is instructed that in order to find that this murder involved "depravity of mind," you must find that the defendant, in perpetrating this murder upon the victim, acted with a depraved mind. A "depraved mind" is a state of mind which is utterly corrupt, perverted or immoral. In determining whether the Defendant acted with a "depraved mind" in this case, you may consider the age and physical characteristics of the victim and you may consider the actions of the defendant before, during, and after the commission of the murder. In order to find that this offense involved depravity of mind, you must find that the Defendant, as a result of an utterly corrupt, perverted or immoral state of mind, and with an indifference to the life or suffering of the victim, committed an aggravated battery or a torture upon a living victim, or subjected the body of a deceased victim, to mutilation, serious disfigurement, or sexual abuse, or that he relished or gained a sense of pleasure from the murder. Depravity of mind requires a corrupt, perverted or immoral state of mind on the part of the Defendant in excess of what was required to accomplish the murder, so it is not enough for the state to merely show that he participated in the victim's death without more. If acts occuring [sic] after the death of the victim are relied upon by the State to show the Defendant's depravity of mind, such acts must be shown to have occur[r]ed so close to the time of the victim's death, and must

have been of such a nature, as to satisfy you beyond a reasonable doubt, that the depraved state of mind of the Defendant existed at the time the Defendant took the actions which resulted in the death of the victim.

[¶ 104.] Here, Moeller specifically contests the phrases, (1) age and physical characteristics of the victim; (2) actions of the defendant before, during and after the commission of the murder; (3) utterly corrupt; perverted or immoral state of mind; (4) with an indifference to the life or suffering of the victim; (5) relished or gained a sense of pleasure from the murder; and (6) corrupt, perverted or immoral state of mind on the part of the defendant in excess of what was required to accomplish the murder.

[¶ 105.] In *Rhines,* we held a definition of depraved mind that included the phrases, "senselessness of the crime," and "helplessness of the victim," was unconstitutionally vague. 1996 SD 55, ¶ 145, 548 N.W.2d at 449. Since those phrases are not included in the challenged instruction, we are unclear how *Rhines* supports Moeller's position. We reject his argument that helplessness is implicit in the phrase "age and physical characteristic of the victim," because the latter phrase provides a limiting description of helplessness and thereby limits the jury's otherwise open-ended discretion.

[¶ 106.] Moreover, Moeller does not direct our attention to any jurisdiction that has held such a phrase to be unconstitutionally vague. We think it is sufficiently limiting, especially when compared to other phrases that have been condemned as overly vague. *See Espinosa v. Florida,* 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992) ("especially wicked, evil, atrocious or cruel"); *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) ("especially heinous, atrocious, or cruel"); *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) ("outrageously or wantonly vile, horrible or inhuman"); *Moore v. Clarke,* 904 F.2d

1226 (8thCir.1990), *cert. denied, Clarke v. Moore*, 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992) ("senselessness of the crime" and "helplessness of the victim"); *State v. White*, 395 A.2d 1082 (Del.1978) ("elderly" and "defenselessness").

[¶ 107.] In comparison, the United States Supreme Court approved a limiting instruction that required evidence of some kind of torture or physical abuse to define "especially heinous, atrocious or cruel" in *Maynard*, 486 U.S. at 364–65, 108 S.Ct. at 1859, 100 L.Ed.2d at 382. It also held that the phrase, "cold-blooded pitiless slayer" sufficiently limited "utter disregard for human life," because it described a murderer's state of mind and was a question of fact that could be inferred from the surrounding circumstances. *Arave v. Creech*, 507 U.S. 463, 471–73, 113 S.Ct. 1534, 1541–42, 123 L.Ed.2d 188, 198–99 (1993). Additionally, the Georgia Supreme Court approved use of the specific phrase "age and physical characteristics of the victim," as a limiting instruction for "depraved mind" in *West v. State*, 252 Ga. 156, 313 S.E.2d 67 (1984). When compared to other challenged phrases, we do not think "age and physical characteristics of the victim" is overly broad in defining depravity of mind.

[¶ 108.] For the foregoing reasons we also reject Moeller's other contentions of vagueness regarding depravity of mind. We note that the phrase "actions of the defendant prior to and after the commission of the murder," was approved by the Georgia Supreme Court in *West*, 313 S.E.2d at 71. We agree.

[¶ 109.] Phrases nearly identical to "with an indifference to the life or suffering of the victim" and "relished or gained a sense of pleasure from the murder" were approved by the United States Supreme Court in *Walton v. Arizona*, 497 U.S. 639, 655, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511, 529 (1990) (refusing to fault state's limiting instruction for "depraved manner" which included the phrases "relishes the murder, evidencing debasement or perversion," or "shows an indifference to the suffering of the victim and evidences a sense of pleasure" in the killing). The phrases used in the limiting instructions in the instant case are so similar to those approved in *Walton* as to furnish sufficient guidance to the jury.

[¶ 110.] Finally, use of the words "corrupt, perverted or immoral" in the instruction are not overly vague. As we stated in *State v. Bullis*: "Unless words of such seeming generality as 'moral' and 'immoral' were valid in statutes [or jury instructions], government itself would become impossible." 89 S.D. 212, 214, 231 N.W.2d 851, 852 (1975) (citation omitted). In that case we additionally held that the use of the word "corrupt" was not so vague as to violate a criminal defendant's right to due process. *Id.* at 214–15, 231 N.W.2d at 852. The word "perversion," a variant of "perverted" was also approved as adequately narrowing a depraved mental state in *Walton*, 497 U.S. at 655, 110 S.Ct. at 3058, 111 L.Ed.2d at 529 and in *Arave*, 507 U.S. at 473–74, 113 S.Ct. at 1542, 123 L.Ed.2d at 199–200.

[¶ 111.] When viewed in its entirety, the depraved mind instruction significantly limited the number of convicted murders eligible for the death penalty and provided specific guidance to the jury. It is not unconstitutionally vague.

*ii. "Torture" definition.*

[¶ 112.] Moeller next claims that the definition of "torture" (Instruction No. 7) does not meet the narrowing requirements of *Godfrey*, 446 U.S. at 428, 100 S.Ct. at 1764–65, 64 L.Ed.2d at 406, because nearly all murders, except those involving instantaneous death or unconsciousness, would meet the trial court's definition.

[¶ 113.] Jury instruction number 7 defining torture provided:

INSTRUCTION NO. 7

The jury is instructed that in order to find that this murder involved "torture,"

you must find, that while the victim was still alive and conscious, the defendant intentionally inflicted severe, unnecessary, physical or mental pain, agony, or anguish, upon her. This could include the victim's severe mental anguish in anticipation of serious physical harm. Unnecessary pain, agony or anguish requires suffering on the part of the victim, in excess of what was required to accomplish the murder, so it does not include any physical or mental pain, agony or anguish which reasonably resulted from the victim's death or her brief anticipation of death. Acts committed after the victim's death or while she was no longer conscious, may not be considered in determining whether "torture" was involved.

[¶ 114.] In *Rhines,* we considered and approved an instruction on "torture" substantially identical to the one presented here. There the instruction stated:

Torture occurs when a living person is subjected to the unnecessary and wanton infliction of severe physical or mental pain, agony, or anguish. Besides serious abuse, torture includes serious psychological abuse of a victim resulting in severe mental anguish to the victim in anticipation of serious physical harm. You would not be authorized to find that the offense of First Degree Murder involved torture simply because the victim suffered pain or briefly anticipated the prospect of death. Nor would acts committed upon the body of a deceased victim support a finding of torture. In order to find that the offense of First Degree Murder involved torture, you must find that the Defendant intentionally, unnecessarily, and wantonly inflicted severe physical or mental pain, agony or anguish upon a living victim.

1996 SD 55, ¶ 160, 548 N.W.2d at 451–52.

[¶ 115.] We noted in *Rhines* that the torture instruction included two essential limiting elements for a finding of torture: (1) the unnecessary and wanton infliction of severe pain, agony, or anguish; and (2)

the intent to inflict such pain, agony, or anguish. *Id.* ¶ 161, 548 N.W.2d at 452. We held that such an instruction was proper because it eliminated from the pool of death-eligible murderers those who intended to kill their victims painlessly or instantly or who only intended to cause pain that was incident to death. *Id.*

[¶ 116.] The challenged jury instruction in the instant case similarly contained both requisite elements for a proper torture instruction. Moreover, it "required the jury to make precise factual inquiries regarding the nature of the victim's injuries and the defendant's intent." *Moeller I,* 1996 SD 60, ¶ 117, 548 N.W.2d at 492. The instruction is not overly vague or otherwise constitutionally infirm.

### iii. "Aggravated battery" definition.

[¶ 117.] Moeller also reiterates his arguments in *Moeller I,* 1996 SD 60, ¶ 113, 548 N.W.2d at 490, that the definition of "aggravated battery" (Instruction 9) did not sufficiently channel the jury's discretion. Alternatively, he argues that if the "aggravated battery" instruction is constitutional, there is insufficient evidence to support a finding that the victim suffered either "torture" or an "aggravated battery" as they are defined, because the extent of physical pain and injuries suffered while she was alive or conscious is unknown.

[¶ 118.] The definition of aggravated battery given to the jury was as follows:

INSTRUCTION NO. 9

The jury is instructed that in order to find that this murder involved an "aggravated battery to the victim," you must find that the victim in this case suffered an aggravated battery to her person, which was inflicted by the defendant; that the aggravated battery involved the infliction of serious physical abuse upon the victim, by depriving her of a member of her body, by rendering a member of her body useless, or by seriously disfiguring her body or a part of

her body; and that the defendant at the time that he inflicted this aggravated battery upon the victim, had the specific intention, design or purpose of maliciously inflicting unnecessary pain to the victim In this context as well, unnecessary pain implies suffering in excess of what was required to accomplish the murder, so it does not include physical or mental pain reasonably resulting from the victim's death or her brief anticipation of death. In determining whether an aggravated battery exists in this case, you may only consider those injuries which were inflicted upon the victim prior to her death. You may not consider those injuries which actually caused the death of the victim. Only those injuries which did not cause the victim's death may be considered by you in determining whether there was an aggravated assault upon the victim.

[¶ 119.] Because the challenged instruction met the requirements of specificity and sufficiently channeled the jury's discretion in rendering a sentence of death, we find no constitutional violations. *Moeller I*, 1996 SD 60, ¶¶ 115–17, 548 N.W.2d at 492.

▮▮▮▮ [¶ 120.] Moreover, the record contains ample evidence to support a finding that the victim suffered both "torture" and an "aggravated battery" prior to her death. The autopsy showed that Becky likely died when her jugular vein was severed by a knife. There was also evidence that prior to her death she sustained numerous other knife wounds that were not incident to death. Further, the pattern of injuries indicated that Becky sustained "defense wounds" to her hands and forearms. Finally, evidence showed that she had been vaginally penetrated while she was alive, and anally penetrated after she was dead. This evidence could have reasonably led the jury to find beyond a reasonable doubt that the murder involved torture, aggravated battery, or a depraved mind.

[¶ 121.] The sentence will not be set aside, because the evidence and all favorable inferences that can be drawn from it support a rational theory of guilt. *Rhines*, 1996 SD 55, ¶ 157, 548 N.W.2d at 451 (citations omitted).

## ISSUE 9.

[¶ 122.] **The trial court's definition of SDCL 23A–27A–1(6), which differed from that given in *Moeller I*, did not violate the double jeopardy or ex post facto provisions of the United States and South Dakota Constitutions.**

### Facts

▮▮▮ [¶ 123.] At the sentencing phase of the first trial, the court instructed the jury regarding "outrageously or wantonly vile, horrible or inhuman" as follows:

The term "aggravated battery" as used in these instructions, is defined as the infliction of serious physical abuse upon the victim, by depriving him of a member of his body, or by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof.

The State has alleged as an aggravating circumstance in this case that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved an aggravated battery to the victim. The State has the burden to prove, beyond a reasonable doubt, the existence of this aggravating circumstance. Before you may find that this aggravating circumstance exists in this case, you must find, beyond a reasonable doubt, that each of the following elements of this aggravating circumstance are proven by the evidence:

(1) That the victim suffered an aggravated battery to his person, inflicted by the defendant.

(2) That the defendant, at the time that he inflicted the aggravated battery upon the victim, had the specific intention, design or purpose of maliciously inflicting unnecessary pain to the victim.

Unless the jury finds that each of the above two elements has been proven by the evidence, beyond a reasonable doubt, then you must give the defendant the benefit of the doubt and find that this aggravating circumstance does not exist.

1996 SD 60, ¶ 112, 548 N.W.2d at 490–91. We noted in footnote 9 of that opinion that "[t]he trial court also provided a definition of 'torture' and 'depravity of mind' for the jury. However, we read the jury instructions as alleging only an 'aggravated battery' and therefore confine[d] our review to the definition of that term." *Id.* ¶ 112 n. 9, 548 N.W.2d at 491 n. 9.

[¶ 124.] In the second trial, the court initially instructed the jury as follows:

### INSTRUCTION NO. 6

The State has alleged as an aggravating circumstance in this case that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim. The State has the burden to prove, beyond a reasonable doubt, the existence of this aggravating circumstance. Before you may find that this aggravating circumstance exists in this case, you must find, beyond a reasonable doubt, that the following elements of this aggravating circumstance are proven by the evidence: (1) That the murder in this case was outrageously or wantonly vile, horrible or inhuman in that it involved at least one of the following factors:

(a) torture; or

(b) depravity of mind; or

(c) an aggravated battery to the victim.

Unless the jury finds that this element has been proven by the evidence, beyond a reasonable doubt, you must give the defendant the benefit of the doubt and find that this aggravating circumstance does not exist.

Unless you find that at least one of the three alternatives set out above,

have [sic] been proven by the evidence, beyond a reasonable doubt, you must give the defendant the benefit of the doubt and find that the aggravating circumstance does not exist. Your verdict form should specify which, if any, of these alternatives you find were involved in the murder.

This instruction was followed by the instructions that further defined "torture," "depravity of mind," and "aggravated battery" discussed in Issue 8, *supra.*

[¶ 125.] On appeal, Moeller asserts that the trial court impermissibly expanded the factors under which he could be found death-eligible. He argues that in the first trial, the only aggravating factor presented was aggravated battery, whereas in the second trial the jury was presented with all three aggravating factors (torture, depravity of mind *and* aggravated battery). He contends that including the other two factors for consideration at the second trial broadened the law and violated the double jeopardy and ex post facto clauses of the United States and South Dakota Constitutions.

### Decision

[¶ 126.] Moeller presents three rationales to support his argument. First, he asserts a lesser-included offense rationale, wherein he claims that:

[T]he court's instruction in the first trial could be classified as a lesser included offense when compared to the court's instruction in the second trial. It was error for the trial judge in the second trial to add elements to the statutory aggravating factor. Defendant had already been convicted on aggravated battery alone, which under the lesser included offense rationale, prohibits a retrial on the greater offense; and secondly, because the jury in the second trial could now use any one of the three elements, as opposed to just one, to find that State proved the aggravating factor, Defendant was subject to exposure to a greater offense.

[¶ 127.] Secondly, Moeller proffers an implicit acquittal rationale. That argument surmises that since the evidence at the first trial was apparently insufficient to persuade the trial judge that he should instruct on torture and depraved mind, the defendant was implicitly acquitted of such aggravating factors. Therefore, Moeller contends, it was error to give them to the jury as separate aggravating factors at the second trial.

[¶ 128.] Moeller's third argument is based on the ex post facto provisions of the United States and South Dakota Constitutions. U.S.Const. art. I, § 10; S.D.Const. art. VI, § 12. He argues that because a trial court is in effect making the law when it issues narrowing instructions, it must also comply with the ex post facto requirement. He asserts that here, when the trial court expanded the aggravated factors from one to three in the second trial, he faced a more encompassing and broader statute than in his first trial. Thus, he contends an ex post facto violation occurred.

[¶ 129.] Moeller offers no authority for such unconventional arguments. An argument not supported by authority could be deemed waived. *State v. Pellegrino*, 1998 SD 39, ¶ 22, 577 N.W.2d 590, 599.

[¶ 130.] Additionally, these arguments are wholly without merit. Their primary fault is that they assume the first trial court deliberately refused to include torture and depraved mind as aggravating factors. However, as we noted in *Moeller I*, the trial court did include instructions to the jury on those two factors. It is unclear why it failed to include them for consideration as aggravating factors along with aggravated battery. From the information in the record, we simply cannot presuppose the reasoning behind the first trial's instructions, whether their design was intended or inadvertent. *See also Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986) (stating that double jeopardy clause does not apply to sentencing phase of capital murder case, at which the "clean slate" rule applied).

[¶ 131.] All these arguments are clearly contrary to the explicit terms of SDCL 23A–27A–1(6), which disjunctively sets forth the three factors: "The offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, *or* an aggravated battery to the victim." (emphasis added). Irrespective of the first trial court's rationale for instructing as it did, we see no error in the second trial judge setting forth all three aggravating factors of torture, depraved mind and aggravated battery for the jury to consider.

## ISSUE 10.

[¶ 132.] **The trial court did not abuse its discretion in refusing Moeller's proposed jury instructions regarding mitigating factors.**

### Facts

[¶ 133.] Prior to the sentencing phase, Moeller submitted a proposed jury instruction specifying a list of possible mitigating factors for the jury to take into consideration while deliberating a sentence. It provided:

If you find that there exists at least one circumstance, you should then consider and take into consideration any mitigating circumstances that exist. You shall consider, take into account, and be guided by the following circumstances, if applicable:

1. Mr. Moeller is poor.
2. Grew up without his natural father.
3. Mother's death in 1990.
4. Disagreements in the evidence on how DNA/serologic evidence should be interpreted.
5. Unwavering declaration of innocence.
6. Mr. Moeller's abuse of alcohol.
7. Mr. Moeller's behavior throughout trial was good.
8. Intelligent.

9. Non-applicability of all other statutory aggravating circumstances.
10. Family loves him.
11. Continued contact with and concern for family.
12. Difficult background.
13. Effect of execution on others.
14. Life without the possibility of parole is the alternative sentence.
15. Mr. Moeller is a human being.
16. Residual doubt.
17. The DNA evidence from a female on Rebecca's inner left thigh.

All or any one of the above may be mitigating circumstances. However, in determining whether or not mitigating circumstances exist, you should consider any other circumstances not listed herein which mitigate the gravity of the crime even though it is not a legal excuse for the crime.

[¶ 134.] The court rejected the instruction, stating "I've instructed on the mitigating circumstances and that the jury is to take into consideration any and all mitigating circumstances offered. It seems to me if the Court was to instruct on a particular list of mitigating circumstances that that really gets into the Court commenting on the evidence in this case."

[¶ 135.] A related discussion also ensued between the parties regarding the extent to which State would be allowed to rebut mitigation evidence presented by Moeller. State contended that although it acknowledged being limited to arguing only statutorily enumerated aggravating factors in its case-in-chief, it should additionally be allowed to rebut any mitigating evidence presented by Moeller. The court agreed, stating that "[it] would be ... inherently unfair to allow the defense to put in unrebuttable mitigating evidence. Then there would be no checks or balances in any way on the defendants and would ... be able to completely misrepresent himself to the jury and that ... would allow a defendant to portray himself in completely inaccurate light to the jury."

[¶ 136.] In response to Moeller's concerns that State might, in its rebuttal, open the door beyond the initial scope of the mitigating evidence, the court first noted that such speculation and abstract questions were difficult to rule on in advance. The court then stated that it was going to strictly require that any rebuttal testimony would have to directly and narrowly rebut the defense evidence. The judge indicated he was not going to offer as much latitude as he would normally give in rebuttal. He further stated that any questionable rebuttal testimony would first be heard outside the presence of the jury.

[¶ 137.] Moeller argues that the trial court violated his constitutional right to due process and right against cruel and unusual punishment by refusing to instruct the jury on specific mitigating factors. He further argues that his constitutional rights were violated by ruling that State was allowed to present rebuttal in the form of "anti-mitigation" evidence at the penalty phase.

### Decision

[¶ 138.] We first consider Moeller's argument, that the trial court violated his constitutional right to due process and right against cruel and unusual punishment by refusing to instruct the jury on specific mitigating factors. In stark contrast to his assertion, the United States Supreme Court recently held that *any* instruction regarding mitigation evidence is not constitutionally required. *Buchanan v. Angelone*, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). In that case the defendant requested the jury be instructed as to four statutorily prescribed mitigating factors which were argued during the sentencing phase. The state court denied such an instruction, and that denial became the basis of a habeas petition.

[¶ 139.] In affirming the court of appeals' denial of the habeas petition, the Supreme Court differentiated the constitutional treatment accorded the two aspects of a capital sentencing procedure. According to the Court, first, in the eligibility phase,

the jury narrows the class of defendants eligible for the death penalty, often through the consideration of aggravating circumstances. At this point the Court stressed the need for channeling and limiting the jury's discretion. 522 U.S. at 275–76, 118 S.Ct. at 761–62, 139 L.Ed.2d at 709–10. In contrast, during the selection phase, the jury determines whether to impose a death sentence on an eligible defendant. Here the Court emphasized the need for a broad inquiry into all relevant mitigating evidence in order to allow an individualized determination. *Id.* Under this view of the capital sentencing process, the *Buchanan* Court concluded that a mandatory instruction on mitigation was not constitutionally required.

[¶ 140.] Reviewing the jury instructions as a whole, we find no abuse of discretion. We agree with the trial judge that giving a specific list of mitigating factors would have improperly instructed the jury. A specific list of mitigating factors might have sent a message to the jury that it could only consider those factors included in the instruction. This would have improperly limited its range of consideration in violation of SDCL 23A–27A–1 and 3. Moreover, as the trial court stated, a specific list might have been perceived by the jury as a comment on the propriety of the evidence presented. This, too, would have been improper.

[¶ 141.] We similarly reject Moeller's second argument, that his constitutional rights were violated by ruling that State was allowed to present rebuttal in the form of "anti-mitigation" evidence at the penalty phase. In support of his position, he specifically claims that the court's refusal to rule in advance on whether it would allow State to rebut his mitigation evidence prevented him from submitting evidence of certain mitigation factors listed in the instruction. According to Moeller, his counsel did not want to risk "opening the door" on certain character evidence which the State vowed it would bring in. Moreover, he contends that nothing in the statutes permit open-ended rebuttal, or anti-mitigation, evidence as suggested by State.

[¶ 142.] Moeller's position is without merit. We agree with the trial court that to foreclose the opportunity for State to rebut any mitigation evidence would allow Moeller to be inaccurately portrayed to the jury. To do so would be inherently unfair and would emasculate a basic tenet underlying our adversary system of justice. Whether Moeller decided to put on mitigating evidence was a tactical decision, which would have of course been subject to attack on rebuttal. As the California Supreme Court stated in this regard:

> Even if we somehow assume additional mitigating evidence existed, counsel did not necessarily have to present it. As always, counsel had to consider the possible detriment as well as the benefit. Presenting mitigating evidence risks opening the door to rebuttal evidence. The prosecution may rebut mitigating penalty evidence with unfavorable revelations about the defendant. In rebuttal, the prosecution is bound neither by its statutory pretrial notice of aggravating evidence nor by the aggravating factors set forth in the statute. The possibility of damaging rebuttal is a necessary consideration in counsel's decision whether to present mitigating evidence about the defendant's character and background.

*People v. Freeman,* 8 Cal.4th 450, 34 Cal. Rptr.2d 558, 882 P.2d 249, 286 (1994) (citations omitted).

## ISSUE 11.

[¶ 143.] **The trial court did not abuse its discretion in refusing Moeller's proposed jury instruction regarding life imprisonment, in refusing State's proposed jury instruction regarding the Governor's authority to commute a life sentence, nor in its response to a question from the jury regarding the definition of life imprisonment.**

### Facts

[¶ 144.] Prior to the sentencing phase, both sides sought to include divergent in-

structions regarding life imprisonment. Moeller sought to include the following instruction to the jury: "You are to assume that if you sentence Donald Moeller to life imprisonment, he will spend the rest of his life in prison." In response, State filed a motion seeking to instruct the jury on the Governor's authority to commute a life sentence.

[¶ 145.] A hearing was held on State's motion, at which it argued if the jury was to be told that "life means life," then it should also be given the counterbalancing information about the potential for a life sentence to be commuted. Moeller responded with the argument that the commutation authority was purely discretionary and too speculative to be given to the jury. After hearing arguments, the court denied State's motion, stating:

It seems as to me [sic] the possibility of a commutation, that's too remote or speculative for the jury to be instructed on that. However, following if the defense brings that [life means life] up or makes the kind of argument I indicated which could in any way indicate that there are no ways that therefore the defendant could be released, that that would open it up. But unless it's opened up in that fashion by the defense I will not allow either an instruction or argument dealing with the Governor's authority to commute life sentences.

[¶ 146.] Later the trial court denied Moeller's proposed jury instruction, reasoning:

The instructions dealing with, in fact, what the actual result of the sentence will be is basically, you know, nobody knows what the future will bring. I refused the State's request to instruct about the Governor's authority to commute sentence. I think likewise to instruct them, which this really does, that the sentence would never be commuted, also would involve me commenting or instructing on these things that I don't know about.

Accordingly, the jury was not given any information about the Governor's authority to commute a life sentence, nor was it instructed that "life means life."

[¶ 147.] The instructions provided to the jury used "life imprisonment," "life sentence," "life in the penitentiary" and "life imprisonment without parole" interchangeably. The verdict form used the term "life imprisonment without parole." During deliberations, the jury foreman sent a note to the court asking: "If the penalty of 'life imprisonment without parole' should be imposed upon the defendant, will he *EVER* have a chance to appear before a parole board?" (emphasis in original).

[¶ 148.] After hearing arguments from counsel, and over the objections of defense counsel, the trial court decided to respond to the jury's question with this statement: "We acknowledge your note asking questions about life imprisonment without parole. All of the information which I can give you is set forth in the jury instructions." That response was sent back in to the jury, which returned a sentence of death the following morning.

[¶ 149.] On appeal, Moeller challenges the denial of his "life means life" jury instruction, as well as the court's response to the jury's question. By notice of review, State raises the issue of whether it was error not to instruct the jury on the Governor's commutation authority.

**Decision**

■■■ [¶ 150.] SDCL 23A–27A–4 provides in part that "[i]f a sentence of death is not recommended by the jury, the court shall sentence the defendant to life imprisonment." SDCL 24–15–4 further states that "[a] person sentenced to life imprisonment is not eligible for parole by the board of pardons and paroles." However, "[t]he Governor may … grant pardons, commutations, and reprieves …" S.D.Const. art. IV, § 3.

[¶ 151.] In *Rhines*, we held there to be no abuse of discretion in the trial court's

rejection of the defendant's following proposed instruction:

> The two specified sentences that you are to consider in this case are death, and life in prison without parole.

> In your deliberations, you are to presume that if you sentence Charles Russell Rhines to death, he will in fact be executed by lethal injection. You must not assume or speculate that the courts, or any other agency of government, will stop the defendant's execution from taking place.

> Similarly, you are to presume that if you sentence Charles Russell Rhines to life in prison without parole, he will in fact spend the rest of his natural life in prison. You must not assume or speculate that the courts, or any other agency of government, will release the defendant from prison at any time during his life.

1996 SD 55, ¶ 121, 548 N.W.2d at 444.

[¶ 152.] Like the instant case, the *Rhines* jury sent a note out to the court during deliberations asking whether the defendant could ever be placed in a minimum security prison or given work release. Based on these questions from the jury, Rhines argued on appeal that the note demonstrated the inadequacy of the trial court's instructions, and that the jury was unduly concerned he would be released if he received a life sentence. We rejected this argument, instead concluding that the instructions as a whole "gave a full and correct statement of the law." *Id.* ¶ 124, 548 N.W.2d at 444. Further, we found no error in the trial court's response to the jury question, which stated, "I acknowledge your note asking questions about life imprisonment. All the information I can give you is set forth in the jury instructions." *Id.* ¶ 104, 548 N.W.2d at 442.

[¶ 153.] In *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the United States Supreme Court addressed the propriety of including the possibility of parole in jury instructions. In that case the defendant was ineligible for parole because of prior convictions. However, the state argued to the jury that his future dangerousness was a factor to consider when deciding whether to impose life or death. The defendant was not allowed to instruct the jury as to his ineligibility for parole. During deliberations, the jury sent out a note asking whether life imprisonment carried the possibility of parole. The court responded by telling the jury not to consider parole when reaching its verdict and that the terms death sentence and life imprisonment were to be interpreted according to their ordinary and everyday meanings.

[¶ 154.] The Supreme Court reversed the sentence. A plurality of the Court held that where a defendant's future dangerousness had been put at issue by the state, and the defendant was ineligible for parole, the jury was entitled to be so instructed. *Id.* at 168–69, 114 S.Ct. at 2196, 129 L.Ed.2d at 145–46.

[¶ 155.] *Simmons* is distinguishable from the situation presented here. First, we note that future dangerousness was not specifically raised as a concern by State. We further note that while not explicitly instructed that "life means life," the jury here was informed that a sentence of life imprisonment was "life imprisonment without parole." Indeed, those were the very words used on the sentence verdict form.

[¶ 156.] Given our previous holding in *Rhines*, and considering the fact that the jury was instructed as to "life imprisonment without parole," we see no abuse of discretion in the trial court's rejection of Moeller's additional instruction to that effect. The instructions were an accurate and complete reflection of the law. Further, we find no error in the court's response to the jury's question concerning life without parole. The court acknowledged patterning its response after the *Rhines* court's response, which was met with approval in this Court. Asking the jury to refer back to the instructions as

given was a proper reply, as the instructions correctly set forth the law. *See Weeks v. Angelone*, 528 U.S. ——, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000) (holding that the Constitution is not violated where, in response to a jury question, the trial court refers the jury to constitutionally adequate instructions).

[¶ 157.] Nor do we accept State's argument that the jury should have been instructed about the Governor's authority to commute a life sentence. In support of this decision we rely on the United States Supreme Court's decision in *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

[¶ 158.] In that case, the United States Supreme Court addressed the constitutionality of a state statute requiring judges to instruct juries about the Governor's authority to commute a sentence. The Court held there to be no constitutional barrier to the state legislature's decision to impose such an instruction on juries. It opined that such an instruction did not preclude individualized sentencing determinations or consideration of mitigating factors, nor did it inject an impermissibly speculative element for the jury's determination. Notably, the majority opinion concluded with the remark that its decision was not intended to override the contrary judgment of states that capital sentencing juries should not be permitted to consider the gubernatorial power to commute a sentence. *Id.* at 1013, 103 S.Ct. at 3460, 77 L.Ed.2d at 1188. In essence, finding no constitutional infirmity, the Court deferred to the decision of the California state legislature.

[¶ 159.] The *Ramos* Court was split 5–4, and the dissenting Justices filed persuasive opinions. As to the merits of a commutation instruction, Justice Marshall contended that it was misleading, speculative and unrelated to the defendant's character or the circumstances of the crime. *Id.* at 1016–22, 103 S.Ct. at 3461–65, 77 L.Ed.2d at 1190–94. In support of his position, he noted that the overwhelming majority of

states rejected arguments or instructions concerning commutation to a sentencing jury. *See id.* at 1026 n. 13, 103 S.Ct. at 3466 n. 13, 77 L.Ed.2d at 1197 n. 13 (citing cases from jurisdictions holding that the jury should not consider the possibility of pardon, parole, or commutation). In addition, Justice Stevens noted in a separate dissenting opinion that California was the only state to have enacted such a statute. *Id.* at 1029, 103 S.Ct. at 3468, 77 L.Ed.2d at 1199.

[¶ 160.] We choose to align ourselves with the holding of the majority of the other jurisdictions that have addressed this issue. *Ramos* can and must be distinguished from the present case, because unlike California, our legislature has not mandated that a commutation instruction should be included.

[¶ 161.] If a court were to include an instruction that the Governor can commute a life sentence to a term of years then, in order to preclude misleading the jury, it would also need to include an instruction that a death sentence is equally eligible for commutation. After all, under our statutory scheme, that scenario is just as plausible as the commutation of a life sentence. The conjectures about what might happen in the future, depending on the Governor and his or her views on the death penalty, are simply too speculative to include in jury instructions. Such instructions are supposed to provide guidance, not invite guesswork. Furthermore, such an instruction is not sufficiently tailored to the individual characteristics and circumstances of the crime. Rather, it is a generic source of rumination, not one that pertains to the unique individuals or circumstances of each case.

## ISSUE 12.

[¶ 162.] **Based upon the appellate review mandated by SDCL 23A–27A–12, Moeller's sentence of death was lawfully imposed.**

[¶ 163.] In every case where the death penalty is imposed, this Court is required

to conduct an independent review of the sentence. SDCL 23A–27A–9. We must determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in § 23A–27A–1; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

SDCL 23A–27A–12.

[¶ 164.] We begin our review by determining whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We find none. We have rejected Moeller's claims that he was prejudiced by the admission of late reports by the soil expert and the pathologist. We dispelled his contention that he should have been given additional time to prepare for the *Daubert* hearing as well as the trial. We have further found no error in the selection of the jury. Nor have we found any breach of attorney-client privileges by the DNA expert who was simultaneously working for both sides. We cannot discern any extenuating circumstances that would warrant overturning the jury's verdict.

[¶ 165.] Moreover, we reject Moeller's contention that there is prohibited arbitrariness in allowing State discretion to decide in which Class A felonies to seek the death penalty. Prosecutorial discretion is a vital part of our criminal justice system. Selective enforcement of SDCL 23A–27A–1 and 22–16–4 is insufficient to show that the statutes have been unconstitutionally applied to a specific defendant, absent a showing that the particular selection was deliberately based on an unjustifiable standard such as race, religion or other arbitrary classification. *State v. O'Brien*, 272 N.W.2d 69, 73 (S.D.1978) (cit-

ing *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446, 453 (1962)). "[P]rosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment." *People v. Ray*, 13 Cal.4th 313, 52 Cal.Rptr.2d 296, 914 P.2d 846, 874 (1996) (citations omitted).

[¶ 166.] Next, we conclude that the evidence supports the jury's finding of at least one statutory aggravating factor under SDCL 23A–27A–1. The jury determined that the murder was outrageously or wantonly vile, horrible or inhuman under SDCL 23A–27A–1(6). It found beyond a reasonable doubt evidence of three separate elements: torture, depravity of mind and an aggravated battery to the victim. There is substantial evidence in the record to support each finding. The record contains evidence that Becky likely died when her jugular vein was severed by a knife. There is also evidence that prior to her death she sustained numerous other knife wounds that were not incident to death. Further, there was evidence that the victim sustained "defense wounds" to her hands and forearms. Finally, evidence showed that the victim had been vaginally penetrated while she was alive, and anally penetrated after she was dead. Clearly this evidence shows torture, depravity of mind and aggravated battery, therefore Moeller was eligible for the death penalty.

[¶ 167.] Finally, we must consider whether Moeller's sentence is disproportionate in comparison to similar South Dakota cases. We decline Moeller's invitation to review our ruling in *Rhines* that the proper pool of similar cases to be considered on proportionality review includes those cases that have proceeded to death penalty deliberations. 1996 SD 55, ¶ 185, 548 N.W.2d at 455.

[¶ 168.] Since the enactment of South Dakota's current death penalty scheme,

ten capital sentencing proceedings, including the present trial, have taken place. In six of those cases, the jury imposed life sentences. In *Moeller I, Rhines,* and *State v. Robert Leroy Anderson,* 2000 SD 45, 608 N.W.2d 644 McCook County Criminal No. 97–70,[16] the jury imposed a sentence of death. We take judicial notice of the seven case summaries set forth in *Rhines* at 1996 SD 55, ¶¶ 187–204, 548 N.W.2d at 456–57. SDCL 19–10–2 (Rule 201(b)). Additionally, we examine the circumstances in *Rhines* and *Anderson.*

[¶ 169.] According to Rhines' statements to police, he was burglarizing a store when Donnivan Schaeffer unexpectedly entered the store. Schaeffer came into the office area of the store and Rhines stabbed him in the abdomen. Schaeffer fell down, thrashed about, and screamed Rhines' name. Rhines stabbed Schaeffer again in the back, piercing his left lung. Rhines then walked Schaeffer out of the office into the storeroom. Rhines could hear air whistling out of the wound in Schaeffer's back. Rhines seated Schaeffer on a pallet in the storeroom. He placed Schaeffer's head between his knees and thrust the knife into the base of his skull. Rhines claims Schaeffer continued to breathe and his arms were moving, so he tied Schaeffer's hands behind him. Rhines estimated that Schaeffer's breathing continued for approximately two minutes after inflicting the final knife wound.

[¶ 170.] State sought the death penalty, alleging four aggravating circumstances: the murder was done for money, it was done to silence a witness, it involved torture, and it involved depravity of mind. This Court invalidated the fourth aggravating factor because of insufficient jury instructions. No mitigating circumstances were presented, but Rhines' family appeared at the sentencing phase and pleaded for his life. The jury imposed a sentence of death, and we affirmed.

[¶ 171.] In *Anderson,* the defendant was sentenced to death for the kidnapping, rape and murder of two young mothers. The jury found that Anderson's kidnapping and murder of Larisa Dumansky was outrageously wanton or vile, horrible or inhuman in that it involved torture or depravity of mind (SDCL 23A–27A–1(6)), and that it was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest (SDCL 23A–27A–1(9)). In addition to the previously described aggravating factors, the jury further found that Anderson raped and murdered the second mother, Piper Streyle, for his own benefit and for the purpose of receiving something of monetary value (SDCL 23A–27A–1(3)).[17]

[¶ 172.] In a comparison to the other cases in the proportionality pool, we conclude a sentence of death was not disproportionate for Donald Moeller's criminal act. First, we note that this is the only case that involves the murder of a young child. It is also distinguishable from the other cases in terms of the abuse inflicted upon Becky before and after her death. Although the two slash wounds to her neck that cut her jugular vein and her vagus nerve would have been sufficient to kill her, Moeller additionally slashed and stabbed Becky on her shoulder, chest, back, hip, arms and hands. Unlike other cases involving aggravated battery, this case is most similar in severity to *Rhines* in that both cases involved the infliction of knife wounds that were intended to cause injury or pain beyond that required to accomplish the murder. Indeed, the wounds suffered by Becky here were significantly more numerous than those suffered by Donnivan Schaeffer at the hands of Rhines.

[¶ 173.] Compounding the knife wounds is the fact that Becky was raped, vaginally and anally, by Moeller. The record shows that he penetrated and tore her vagina

---

16. This case is currently on appeal to this Court. *State v. Anderson,* South Dakota Supreme Court No. 21021.

17. *See also State v. Anderson,* 2000 SD 45, 608 N.W.2d 644.

while she was alive. Even more disturbing is the fact that he anally penetrated and deposited semen inside Becky after she was dead, this evidenced by the lack of blood or bruising around the torn anus. After he abducted, raped, slashed, stabbed and then raped Becky again, he left her broken, bloody body alongside a dirt road in the rain. He offered no mitigating evidence for his actions, other than arguments regarding being dealt a "bad hand" in life, residual doubt, and the morality of the death penalty.

[¶ 174.] Although this case was proven on circumstantial evidence, that does not in any way affect the validity of the sentence. Included among the evidence linking Moeller to the crime was a showing that: (1) despite Moeller's denying that he was acquainted with Becky, one of her friends testified that Moeller occasionally bought popsicles for her and Becky; (2) an eyewitness had seen a man resembling Moeller talking to Becky near the location where she was last seen; (3) according to friends, Moeller visited the entrance to the secluded crime scene two days prior to Becky's rape and murder; (4) a vehicle similar to Moeller's was seen leaving the location where Becky's body was found at the approximated time of the crime; (5)

Moeller fled to Tacoma, Washington on May 13, 1990, just one day after his initial police interview concerning Becky's death, where he lived under the fictitious name of John David Larson; (6) after Moeller fled to Washington on May 13, 1990, police searched his room and found under his bed a section of the May 13, 1990 Sioux Falls newspaper containing a composite sketch of Becky's assailant and an article discussing the crime; (7) Moeller's clothes, which would have been subjected to soil analysis, were found freshly washed in his otherwise messy, filthy room; (8) soil on Moeller's vehicle was consistent with soil from the crime scene; and (9) DNA evidence provided an estimation of how often the characteristics that were common to Moeller and the sperm found in Becky's rectum would be seen in the Causasian population; the result was 1 of every 130 million individuals.

[¶ 175.] Faced with the atrocity of the crime and the solid circumstantial case showing that Moeller was clearly culpable, we conclude the imposition of the death sentence was neither excessive nor disproportionate.

[¶ 176.] Affirmed.[18]

18. We have considered Moeller's other issues and find them lacking merit or resolved by our decisions in *Moeller I* or *Rhines*. Those issues include:
   (1) Whether the trial court abused its discretion in allowing the testimony of State's soil expert?
   (2) Whether allowing the trial court to channel the sentencer's discretion violates Moeller's right to fair notice under the due process and separation of powers clauses of the United States and South Dakota Constitutions?
   (3) Whether the trial court abused its discretion in refusing Moeller's proposed jury instructions regarding residual doubt?
   (4) Whether the trial court abused its discretion in allowing the prosecution to give a rebuttal argument at the sentencing phase?
   (5) Whether the trial court erred in admitting results of DNA DQ-alpha typing evidence?
   (6) Whether SDCL 23A–27A–1(6) is unconstitutionally vague and overbroad?
   (7) Whether the death penalty is proscribed by Article VI, § 23 of the South Dakota Constitution?
   (8) Whether SDCL ch 23A–27A is unconstitutional in that it provides insufficient guidance to the sentencer?
   We also deem it unnecessary to consider State's notice of review issue 1, and we find that notice of review issues 2 and 4 are moot. Those issues were:
   (1) Whether the trial court abused its discretion in allowing Moeller to present moral and religious arguments against the death penalty during closing arguments in the sentencing phase?
   (2) Whether it was error to grant allocution to Moeller?
   (4) Whether the trial court abused its discretion by allowing Moeller to depose a witness twice before trial?

[¶ 177.] KONENKAMP and GILBERTSON, Justices, and JOHNSON, Circuit Judge, concur.

[¶ 178.] AMUNDSON, Justice, dissents.

[¶ 179.] JOHNSON, Circuit Judge, sitting for SABERS, Justice, disqualified.

AMUNDSON, Justice (dissenting).

[¶ 180.] I respectfully dissent as to the following issues.

[¶ 181.] **6. Whether the trial court abused its discretion in admitting a belated report by State's soil expert, and in failing to conduct a *Daubert* admissibility hearing on the soil expert's testimony.**

[¶ 182.] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2794, 125 L.Ed.2d 469, 480 (1993), the United States Supreme Court established specific standards for admission of expert scientific testimony. Recently, the *Daubert* gate-keeping decision was expanded to apply to " 'technical' and 'other specialized' " expert testimony, as well as testimony from scientific experts. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238, 249 (1999) (citing Fed.R.Evid. 702). *See also Estate of Dokken*, 2000 SD 9, ¶ 51, 604 N.W.2d 487, 500 (Amundson, J., concurring specially) (quoting *Kumho* as expanding the *Daubert* gate-keeping function). This Court recognized in *Kuper v. Lincoln–Union Electric Co.*, 1996 SD 145, ¶ 41, 557 N.W.2d 748, 760, that "when the trial court is ruling on the admissibility of an expert opinion, the trial court needs to exercise its gatekeeping function" to determine that the opinion has a reliable foundation and is relevant to the case at hand. To exercise its gatekeeping function, the trial court must determine both the reliability and the relevancy of the expert's testimony. *See id.*

[¶ 183.] In *United States v. Carroll*, 2000 WL 45870, *8 (E.D.La.) (quotation omitted), the United States District Court addressed the *Daubert* and *Kumho* reliability prong and noted that *Kumho* "does not require district courts to reinvent the wheel every time expert testimony is offered in court." However, this does not allow the trial court to sit idly by and automatically admit an expert's testimony. As the Tenth Circuit Court of Appeals recently stated in *United States v. Velarde*, 214 F.3d 1204, 1209 (10th Cir.2000), "[w]hile we recognize that the trial court is accorded great latitude in determining how to make *Daubert* reliability findings before admitting expert testimony, *Kumho* and *Daubert* make it clear that the court *must,* on the record, *make some kind of reliability determination.*" (Emphasis added).

[¶ 184.] In interpreting the court's reliability determination under *Kumho*, the court in *Bacardi & Co., Ltd. v. New York Lighter Co., Inc.*, 2000 WL 298915, *3 (E.D.N.Y.) (quotation omitted), concluded,

[t]he fact that [the expert witnesses] are educated and experienced in their respective fields, however, does not end the inquiry into reliability. Rather, the Court also must consider whether the experts "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

[¶ 185.] In the present case, John Wehrenberg, a retired professor of geology who specializes in forensic examinations of soils, submitted a report concluding that the soil sample taken from the left front fender of Moeller's pickup was similar to a soil sample that he took from the crime scene. The justification for Wehrenberg's determination was the existence of a mineral called "gahnite" which is a "very rare" mineral. Wehrenberg's results were not the basis of some geological forensic test, but rather, were determined by a "visual inspection." [19] Prior to Wehren-

---

**19.** The testimony cited in the majority decision leaves out a critical aspect of what this witness said and namely:

berg's testimony, Moeller requested a *Daubert* hearing to determine the reliability of Wehrenberg's reasoning and methodology in concluding that the mineral was gahnite. The trial court denied Moeller's request, concluding that based upon his qualifications and our prior decision in *State v. Moeller*, 1996 SD 60, ¶ 92, 548 N.W.2d 465, 486, the evidence tendered by Wehrenberg was admissible.[20]

[¶ 186.] In concluding that no *Daubert* hearing was required to determine the reliability of Wehrenberg's testimony, the majority opinion would hold that because an expert says it is gahnite, it must be gahnite. It is not enough to rely on an expert's self-proclaimed determination, more is required to determine the reliability of the expert's results. *See e.g., American Tourmaline Fields v. International Paper Co.*, 1999 WL 242690, *5 (N.D.Tex. 1999) (citing *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir.1999) (noting that expert's self-proclaimed accuracy is insufficient)).

> Q. (Moeller's Attorney): When you take out the minerals that are ... common to any place east of the Rockies and one would expect to find nearly anywhere in South Dakota how many points of comparison were there that were of substantial interest to you?
>
> A. (Wehrenberg): Well, in terms of the mineral grains themselves there was, certainly with the hornblende was the significant one, the rutile, biotite, there is a mineral that I tentatively identified as gahnite which is a rather rare mineral which I found in both samples. And that, that gahnite could conceivable be an individuating mineral if I knew more about the distribution of gahnite in this region. *I don't know that, though, however.* (Emphasis added to depict the deleted testimony by the majority opinion.)

Wehrenberg testified at the first trial that he did not know and his testimony at the second trial does not set forth any additional work done by this witness to tell this reader why he now knows.

20. At the conclusion of the trial court hearing on the admissibility of this new insignificant opinion involving this rare mineral, the trial court held as follows:

> THE COURT: Okay, And I think my view of the Daubert standard is somewhat

[¶ 187.] To allow an expert to testify that this rare mineral existed at the crime scene and on the defendant's wheel well without any determination as to the reliability of the expert's result, reasoning or methodology is a clear violation of the trial court's gatekeeping function. I cannot condone the acceptance of an expert's testimony based solely upon his own self-proclaimed accuracy.[21] At the very least, a reliability determination must be made on the record to allow this Court to adequately execute its appellate role. This was not done here and I would hold that the trial court erred in refusing to hold a *Daubert* hearing to make such a determination.

[¶ 188.] The State, in oral arguments before this Court, argued that this issue is insignificant. In a capital murder case, is anything insignificant? I would say no, especially when State hires an expert and later utilizes the evidence in its closing

> more liberal than the Frye standard under which this was admitted. I'm going to find it is admissible based upon the qualifications that he's shown and the ruling of the Supreme Court already in regard to the evidence tendered by him.

In *Moeller I*, there was no determination under *Daubert* of reliability and here, there was also no reliability as to the existence of this rare mineral. Even in a capital murder case with the deplorable facts involved here, it still remains the duty of the courts to determine that testimony of paid experts is reliable and not just rely on credentials.

21. In preparing for the second trial, this expert wrote a letter on April 7, 1997, to Jeff Masten, Director of Research at RMA Research in Sioux Falls, South Dakota, making the following response to the question of "how rare is gahnite:"

> . . . .
> Hence, gahnite must be very rare.
>
> . . . .
> Other physical aspects of the mineral are more suggestive of gahnite than common spinel.

This fuzzy response certainly does not equal reliability without further testing.

arguments. Any argument that this issue is insignificant is zany at best. It might have been insignificant in *Moeller I* in view of the fact it was not a major point, but there must have been some significance of the testimony in *Moeller II*-otherwise, why would this expert's testimony have focused on the rarity of gahnite in *Moeller II*.

[¶ 189.]  **12.  Whether Moeller's sentence of death was lawfully imposed.**

[¶ 190.] I again adopt my dissent filed in *State v. Rhines*, 1996 SD 55, 548 N.W.2d 415.

[¶ 191.] This is an ominous task to undertake based upon the end result of proportionality review.  In performing this statutorily mandated function, this Court has to determine whether or not the death sentence in South Dakota is being disproportionately imposed in similar cases.  I submit that the awesome responsibility of this Court in performing such a review requires that we consider a much more extensive universe of cases then contained in the majority opinion.  An example being, State v. VanEngel, CR91–2045, which is a case in our judicial system where the defendant was charged with the murder, kidnapping and rape of a twelve-year old Argus Leader newspaper carrier and was ultimately sentenced to life imprisonment. Therefore, in order to really determine whether the death sentence is being disproportionately applied in South Dakota, all cases eligible for the death penalty have to be reviewed to determine if the death penalty in South Dakota is being imposed fairly and uniformly and not in an arbitrary fashion.